PUBLISH

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 92-2872

_____

D. C. Docket No. 91-03052-RV

UNITED STATES OF AMERICA,

Plaintiff-Appellee,
Cross-Appellant,

versus

WILLIAM MICHAEL ADKINSON,
ANN POWELL MINKS, f.k.a. Ann Powell, et al.,

Defendants-Appellants,
Cross-Appellees.

_____

No. 95-2061

_____

D. C. Docket No. 91-03052-RV

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RONALD D. PEEK, ANN POWELL MINKS, et al.,

Defendants-Appellants.

Appeals from the United States District Court
for the Northern District of Florida

**(February 23, 1998)**

Before DUBINA, Circuit Judge, and HILL and GIBSON*, Senior Circuit Judges.

*Honorable John R. Gibson, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

HILL, Senior Circuit Judge:

Defendants appeal from the denial of their motion for a new trial and from their convictions and sentences upon multiple counts of conspiracy, bank, mail and wire fraud, interstate transportation of stolen property and money laundering. The government appeals the district court's determination that the sentencing guidelines do not apply to these defendants. For the following reasons, all convictions and sentences WILL BE REVERSED AND VACATED.[1]

I.

Confronted with a situation similar to the one presented here, a judge wisely wrote:

---

[1]We do not reach the government's appeal. Judgment to this effect will follow further proceedings consistent with this opinion.

> Although there is ample ground for argument that the Supreme court has doubts about *Lau's* continued vitality, a requiem may be premature and, in any event, should not be sung by this choir.

*NAACP v. Medical Center, Inc.*, 657 F.2d 1322, 1330 (3d Cir. 1981) (Judge Joseph Weiss).

Had this admonition been taken to heart at the outset of this case, a most troublesome path would have been avoided.

## II. Background

This case began as a basic bank fraud case arising out of alleged false statements and misrepresentations made to procure loans for a land development project and that large amounts of loan proceeds were allegedly diverted for personal use. Somewhere along the line, the case mutated into a broad conspiracy against the government involving wire, mail, and tax fraud, interstate transportation of

money taken by fraud and money laundering.[2] There was evidence of the following facts.

William Adkinson, a Houston real estate developer, had expanded a modest business of acquiring and renovating foreclosed homes into a complex series of interlocking corporate entities under the umbrella of The Development Group, Inc. (DGI). Adkinson named Ronald Peek president of DGI. During this time, Adkinson met Keith Cox, a London solicitor. Cox represented a group of Kuwatis who invested internationally through a multi-billion dollar company called Compendium Trust. After several successful business ventures with Cox, Adkinson began to engage in large, complex real estate transactions.

---

[2] The district court stated at the end of the government's case:

> Preliminarily, let me just say that this has probably been the most difficult case to try to understand what is charged and what the evidence is of any criminal case that I have ever dealt with, and I suspect most of you can say the same thing. Part of the problem is that the government has attempted to turn a bank fraud case into a case that includes an income tax case and a mail fraud and wire fraud, and everything else, and the pieces simply don't fit together very well; and, when you have as far-reaching factual circumstances that are in this case, it makes it extremely difficult to try to deal with all of the defendants and all of these charges that, for the most part, are not even related.

In the summer of 1985, Adkinson became interested in purchasing an exceptional piece of beachfront property and contiguous forest land from the St. Joe Paper Company of Jacksonville, Florida (St. Joe). The property is situated in the panhandle of Florida and includes 6.5 miles of sugar white beaches, dense pine forests, fresh water lakes and magnificent sand dunes.

Adkinson employed Robert Alligood, then president of the engineering firm of Reynolds, Smith & Hills (RS&H), to help Peek and him negotiate the purchase from St. Joe. Alligood had a relationship with the principals of St. Joe that Adkinson hoped would help in the negotiations. In addition, RS&H performed engineering studies on the feasibility of developing the property. Alligood and RS&H were to receive a broker's commission of $3 million through its real estate subsidiary, Plantec Realty Corp.

A contract was ultimately negotiated, providing for $50 million in cash for approximately 780 acres, a tax-free property exchange of 18,000 interior acres, and an additional 2,000+ acres purchased on a seller-financed note and mortgage for $132 million. The contract provided for the immediate release of portions of the beach front and a staged release of the other land as mortgage payments were made.

On October 3, 1985, the contract was entered into by St.Joe and Panhandle Coast Investors, Inc. (Panhandle), a Florida corporation, formed at the request of

Cox who had joined the deal.[3]  Adkinson's attorney, Robert Collins, had arranged for Panhandle to be formed.

The contract required a deposit of $2.1 million in earnest money with Imperial Title Company, a title company owned by Collins and Ann Powell Minks. Adkinson sent two DGI checks to Minks, totaling $2.1 million, to establish the escrow account. On October 7, 1985, Minks communicated to St. Joe receipt of the deposit. On October 9, 1985, Panhandle assigned its interest in the land purchase contract to DGI.  Funding for the land purchase was originally to be provided by a bank with which Adkinson had done business over several years.  That bank, however, backed out.  In order to cover the DGI checks, Adkinson moved the escrow account to West Belt National Bank (Bank) and that bank honored the checks based upon an agreement by Sandsend Financial Consultants, Ltd. (Sandsend), the lending arm of Cox' Compendium Trust, to fund the escrow from a certificate of deposit.  The Bank confirmed that the total escrow was on deposit as of March 12, 1986, and Minks and Collins communicated this fact to St. Joe.[4]

---

[3] Cox was named as a defendant in this case, but was not tried.

[4] The account statement did not show a deposit of the funds until March 23, 1986.

6

The certificate of deposit had a maturity date of March 19, 1986. Sandsend redeemed the certificate on March 21, 1986.

In April of 1986, Adkinson secured a purchase money loan from Hill Financial Savings Association (Hill) of Red Hill, Pennsylvania. As structured by Hill, the loan would be to a joint venture comprising a DGI subsidiary, FSD Group, Inc. (FSD), and a subsidiary of Hill. The joint venture would be called Emerald Coast Joint Venture (Emerald Coast), which would take the property in its name and execute the loan document. Ronald D. Peek, president of DGI, was also president of FSD.[5]

Subsequently, Hill became concerned that the loan might be considered an investment, which by law it was not permitted to make. Hill retained the accounting firm of KPMG Peat Marwick to perform an accounting investigation of the loan, which included a close examination of the borrower, DGI, and its principal, Adkinson. Richard Sundheim, of Main Hurdman now Peat Marwick, performed the audit.

Consequently, as one of the conditions of the loan, Hill required Emerald Coast to pre-sell approximately 130 acres of the property. In order to satisfy this

---

[5] Adkinson formed a subsidiary, The Accounting Group, Inc. to handle all his and his companies' accounting, administered by Rick Maniscalco, who reported directly to Adkinson.

requirement, Adkinson approached his friend, Robert Corson, who had recently purchased a Texas savings association, Kleberg County Savings Association of Kingsville, Texas, later known as Vision Banc. Vision Banc agreed to make loans to four entities for the purpose of purchasing the 130 acres.

Adkinson and Cox chose Crossview Development Company, owned by a Kuwati investor, a client of Cox, as one of the entities. Two others were former DGI subsidiaries, First Western Equity, Inc. and Development Mortgage Group, Inc. (DMG), which were in the process of being sold off to their respective presidents, Barney Van Huss and Gilbert G. Dufilho. Both Van Huss and Dufilho agreed on behalf of their respective companies to participate in the transactions. The fourth company, suggested by Corson, was Ferguson/C & D, Inc., owned by Robert Ferguson.

On May 26, 1986, a new brokerage agreement was executed between Adkinson and Plantec in which Plantec and Koshkin would share one-third and two-thirds, respectively, in a 5% or $9.1 million brokerage commission. The agreement was backdated to August, 13, 1985, by Plantec's president.

On June 1, 1986, Cox and Adkinson entered into an agreement that Sandsend would lend DGI $30 million to be used to purchase the contract rights to approximately 268 acres of the Walton County land purchase from Panhandle. In

consideration for the loan, DGI would arrange for St. Joe to deed those acres to Sandestin Investors, Inc., a wholly owned subsidiary of Sandsend.

On June 2, 1986, the four loans from Vision Banc to the above-named entities were closed in Houston. Adkinson's lawyers, Robert Collins and Daniel Kistler, were present. A newly formed Florida corporation, Walton County Investors, Inc. (Walton) acted as the initial purchaser of the 130 acres from St. Joe. It then sold off tracts of the 130 acres to the four entities for an aggregate price of $48 million, of which $20.4 million was provided by Vision Banc.

On June 3 through June 5, 1986, the Hill loan transaction closed in Jacksonville, Florida. At closing, however, Hill demanded material changes in the structure of the loan transaction. Hill required Adkinson to purchase certain real estate owned by Hill, cede a greater equity share (75%) of the Florida purchase to it, and transfer to Hill 7,300 acres of the most valuable property as a loan fee. Adkinson objected, but chose to close.

The land was conveyed by four separate deeds. Crossview took 260 acres directly; a second deed went to Emerald Coast; a third to Hill for the 7,300 acres it had demanded at the last minute; and the fourth deed was to Walton for the 130

acres. The escrow funds were paid by Imperial to St. Joe upon closing.[6] Plantec received a commission of $9.1 million by way of checks in the amounts of $1, $2 and $6.1 million. Plantec had agreed to lend $1 million to DGI so it could close, so the $1 million check was endorsed by the president of Plantec over to DGI, and returned to Collins. Collins gave Alligood a promissory note signed by Adkinson as president of DGI for the loan back. The $6.1 million check was endorsed to Benjamin Koshkin, a real estate broker who had worked on the deal. Koshkin paid the $6.1 million to Sandsend to reduce Adkinson's and Koshkin's liabilities to Sandsend.

After closing, Adkinson sued Hill, claiming usury and bad faith relating to its eleventh-hour modifications to the loan agreement. The suit was settled; Hill agreed to convey to the joint venture the 7,300 acres it had taken as a fee and to make an additional $12 million loan.

Some time later, Sandsend acquired all of Adkinson's DGI stock in a foreclosure. Sandsend continued to develop and market the property, including an effort to sell portions to the State of Florida. Political contributions were made to

---

[6] St. Joe learned of Collins' interest in Imperial prior to closing.

certain state officials which are alleged to have been attempts to influence the State to buy the property.

Ultimately, the sale to the State was not successful, and mortgage payments were not made in a timely fashion. St. Joe sued for foreclosure, and settled for the return of 2,000 acres. Vision Banc released any remaining liability in exchange for transfer of the mortgaged property. Adkinson declared personal bankruptcy.

### III. Indictment and Pre-Trial Proceedings

On September 27, 1991, a grand jury empaneled by the United States District Court for the Northern District of Florida, Pensacola Division, returned a 115-page, fifteen count indictment against fourteen defendants. Count I of the Indictment alleged a conspiracy to commit an offense against the United States in violation of 18 U.S.C. § 371. The conspiracy was said to have five objectives: to impede the Internal Revenue Service (IRS); to defraud Hill and Vision Banc; to commit mail and wire fraud in defrauding the banks; and to transport their fraudulent proceeds interstate.[7] Counts II through XV alleged substantive violations of the same offenses. Counts II and III alleged bank fraud; Counts IV, IX, X, mail fraud; Counts V and VI, VII, wire fraud; and Counts VIII, XI, XII charged interstate

---

[7]The statutes alleged to have been violated are 18 U.S.C. §§ 1341, 1343, 1344, 1956 and 2314.

11

transportation of money taken by fraud.  Finally, Counts XIII, XIV, and XV charged money laundering.

Defendants moved to dismiss Count I pointing out that four of the five conspiratorial objectives alleged in Count I did not state an offense.  The then-controlling law of this circuit required the United States to be the victim of a Section 371 conspiracy.  *United States v. Hope*, 861 F.2d 1574, 1577 (11th Cir. 1988) (*Hope I*); *United States v. Hope,* 901 F.2d 1013, 1018 (11th Cir. 1990) (*Hope II*).  Four of the five conspiratorial objects (objects 2-5) alleged in Count I, however, describe a scheme targeted not at the United States but at two private banks--Hill and Vision Banc.[8]  Defendants objected that the government had persuaded the grand jury to indict them on a count, eighty percent of which, under then-controlling law, alleged no crime at all.

Several defendants also moved for severance, arguing that dismissal of the improper bank fraud conspiracy from Count I would require their severance since their joinder was predicated upon allegations of a broad bank fraud conspiracy. These defendants  argued that the tax fraud which would remain the sole object of

---

[8]A federally insured financial institution is not a federal agency under Section 371.  *See United States v. Falcone*, 934 F.2d 1528,1535(11th Cir. 1993).

the Section 371 conspiracy charged in Count I could not support their continued joinder.

At the hearing on the motion, *the government admitted that the bank fraud conspiracy alleged in Count I did not, under Hope I and Hope II, state a violation of Section 371.* Nevertheless, government counsel, asserting that there was ample ground for the argument that the Eleventh Circuit had doubts about the continued vitality of *Hope I* and *Hope II,* urged the district court not to dismiss the allegations of bank fraud as objects of the conspiracy. The government counseled the court to defer ruling.

The government pointed out that, in July of 1991, a panel of this court, following *Hope I* and *Hope II*, had reversed convictions under Section 371 because the offense alleged was directed against private banks rather than the United States. *United States v. Falcone*, 934 F.2d 1528, 1539 (11th Cir. 1991). The panel, however, had expressed "some doubts" about *Hope I*'s continued vitality.[9] *Id.* at 1539. Then, on August 12, 1991, this court announced that it would rehear *Falcone* en banc.[10] 939 F.2d 1455 (11th Cir. 1991) (en banc). The government had drafted

_____

[9]Still, the *Falcone* panel concluded, "[w]e are bound, however, to follow circuit precedent." *Id*.

[10]This announcement vacated the panel opinion in *Falcone*. Nevertheless, *Hope I* and *Hope II* remained the controlling precedent in this circuit. *United States v. Hogan*, 986 F.2d 1364, 1369 (11th

Count I, knowing it was subject to dismissal under the circuit's controlling precedent, but with the expectation that *Falcone*, en banc, would overrule *Hope I* and *Hope II*, and that, *at that point in time*, all of Count I could sustain a conviction. The government urged the court to take what it characterized as a "high risk" approach to the trial of these defendants:

> Your Honor, . . . may I suggest one other alternative, the bold, high level, high risk approach, and that is to simply leave the indictment as is and if *Hope* is sustained let them take it up on appeal and *have it reversed.* (emphasis added)

The court noted this invitation to error:

> [I]f we treat [the motion to dismiss] as not having been granted and the evidence is admitted as if all those other purposes were part of the conspiracy and then the Eleventh Circuit decides that *Hope* is still the law, I think we've got an *almost virtual certainty for a mistrial.* (emphasis added)

In its written order the next day, the court elected not to dismiss the bank fraud conspiracy.[11] On the government's assurance that *Falcone* would legitimize

---

Cir. 1993).

[11]Defendants, of course, were entitled to a ruling on their motion. A Rule 12(b)(2) motion aimed at the sufficiency of the indictment which is capable of determination without the trial of the general issue "*shall* be determined before trial unless the court, for good cause, orders that it be deferred for determination at the trial of the general issue or until after verdict . . . ." Fed. R. Crim. P. 12 (e). *United States v. Coia*, 719 F.2d 1120, 1123 (11th Cir. 1983). "A defense is capable of pretrial determination if trial of the facts surrounding the commission of

14

the allegations of Count I at some point during the trial, the district court agreed to

proceed to trial on Count I as though it could sustain a conviction.[12]

## IV.  The Trial

The trial lasted five months; 115 witnesses generated more than 85 volumes

and 17,500 pages of transcript; 1,447 exhibits were admitted.  Although the court

had indicated that the government should refrain from mentioning objects 2-5 in its

opening statement, the court itself during voir dire told the jury:

> The indictment charges that the defendants *conspired* among themselves and with others to violate the law in a number of respects.
> . . *it includes an allegation to defraud these lending institutions* and to impede the Internal Revenue Service. . .

Over the next five months, defendants objected to a mass of evidence on the

grounds that it was, under *Hope I* and *Hope II*, irrelevant, and certainly would be

irrelevant if the court  ultimately dismissed the bank fraud conspiracy from Count

---

the alleged offense would be of no assistance in determining the validity of the defense." *United States v. Covington,* 395 U.S. 57, 60 (1969). Thus, good cause for deferral exists only if facts at trial will be relevant to the court's decision, but "a district court *must rule* on any issue entirely segregable from the evidence to be presented at trial."  *United States v. Barletta*, 644 F.2d 50, 57-58 (1st Cir. 1981) (emphasis added); *accord*, *United States v. Jones*, 542 F.2d 661, 664-65 (6th Cir. 1976) (district court must dispose of motions raising legal defense prior to trial if it can).

[12]Of course, if a jury convicts on a count containing insufficient grounds, the conviction cannot stand since the verdict may have rested on the insufficient ground.  *Zant v. Stephens*, 462 U.S. 862, 881 (1983).

I. Defendants argued that had the bank fraud conspiracy been dismissed before trial, as the law required, much of the evidence would have been inadmissible under Rule 404(b) as evidence of "other bad acts." The district court, again upon the government's assurance that all the evidence was "inextricably intertwined" with the bank fraud conspiracy, allowed it under the government's "high risk" strategy.

The "high risk" strategy did not pay off.[13] The requiem for *Hope I* and *Hope II* remained unsung by the Eleventh Circuit choir and the en banc decision in *Falcone* did not issue by the time the government rested its case. The defendants, of course, renewed their objections to being tried for "non-crimes."

---

[13]This opinion makes clear that indictments should follow rather than anticipate the law; therefore, we express no opinion on whether the "high-risk strategy" urged upon the court would have been successful had *Falcone* issued earlier. We note only that the new rule announced by the en banc court in *Falcone* was applied retroactively in that case. 960 F.2d at 990. *But see Bouie v. City of Columbia*, 378 U.S. 347, 353 1964)(an unforeseeable judicial enlargement of a criminal statute, applied retroactively, operates precisely like an ex post facto law, such as Article I, § 10, of the Constitution forbids). *See also United States v. Burnom,* 27 F.3d 283, 284 (7th Cir. 1994)(a clear break in the law that imposes criminal liability for acts not previously punishable may not be applied retroactively to criminal defendants' detriment); *United States v. Jenkins*, 349 F. Supp. 1068, 1073 (E.D.N.Y. 1972) (district court would not permit criminal prosecution based upon criminalization of defendant's act by an intervening court decision because it would "seriously erod[e] fundamental and basic equitable principles of law"), *aff'd on other grounds*, 432 U.S. 358(1975) (double jeopardy).

At the urging of the government, the court had proceeded as though the bank fraud conspiracy alleged in Count I was sufficient to convict these defendants of a violation of Section 371, even though it was not, either at the time the Indictment was returned or at the conclusion of their trial. After four months of trial, the government and the district court, having taken off in an aircraft without wings, anticipating that *Falcone* en banc would supply them, decided that an emergency landing was in order and dismissed the bank fraud conspiracy.[14]

At this point the district court was in exactly the position it had predicted it would be in if the en banc *Falcone* decision had issued "and . . . the Eleventh Circuit decides that *Hope* is still the law, . . . an *almost virtual certainty for a mistrial.*" Defendants did move for the mistrial the court had predicted, arguing that the nature of the Indictment and trial had changed midstream. Even though the court had forecast a mistrial under these circumstances, it denied the motion.

---

[14]The district court, having allowed the government to proceed on these objectives, on April 15, 1992, entered judgments of acquittal as to objectives 2-5 of the conspiracy alleged in Count I. On May 20, 1992, the en banc decision in *Falcone* did overrule *Hope I, Hope II,* and the *Falcone* panel. 960 F.2d 988, 990 (11th Cir. 1992). That these acts later became sufficient is of little importance in this appeal since they are no longer a part of this case and further prosecution on them is barred. *Lee v. United States*, 432 U.S. 23, 30 (1977). Nor does their subsequent validation by *Falcone* change the fundamental unfairness of trying these defendants under the law of *Hope I* and *II*, but permitting the government to proceed as though en banc *Falcone* were the law.

This was not the only unusual circumstance attending this trial. Immediately prior to trial, government counsel filed a pleading, to which he attached his own affidavit, alleging that "the" defendants had threatened to kill a government witness, had threatened another witness at gunpoint, had beaten and left an unconscious witness in a burning car, and committed other acts of intimidation. These allegations became front page headlines on the morning of jury selection. This inflammatory pleading should have been filed sealed,[15] but government counsel, having filed it without seal, explained that his secretary had overlooked the necessity. During the trial, jurors speculated in the jury room about which defendants had threatened to kill which witnesses.[16]

---

[15]The district court found that government counsel had violated the local rule requiring all parties to a criminal trial to avoid the release of information which a reasonable person would expect to become the subject of pre-trial publicity if there is a substantial likelihood that such publicity would cause material prejudice to a fair trial. *See* Rule 77.3 (B)(1), Local Rules for the Northern District of Florida. Furthermore, when questioned by the court regarding the necessity to protect the witnesses, government counsel conceded that the alleged threats had occurred two to four years prior and that his office was conducting no current investigation of threats.

[16]The district court found that the pre-trial publicity was an improper extrinsic influence on this jury, but held there was no prejudice. *But see United States v. Perkins*, 748 F.2d 1519, 1533 (11th Cir. 1984) (a new trial is required if the [extrinsic] evidence poses a *reasonable possibility* of prejudice to the defendant) (emphasis added).

Additionally, the government offered the testimony of the now "retired" Peat Marwick accountant, Richard Sundheim, who had audited the Hill loan on the critical issue of the quality of the loan. Sundheim testified that he had audited the proposed loan and "flagged it" because it was seriously under-collateralized, the borrowers were not at risk, and, therefore, it was not really a "loan" at all, but an investment. A year later in a deposition taken by the Resolution Trust Corporation, Sundheim gave exactly the opposite testimony. He testified that he had concluded that the loan was well within banking guidelines, was adequately collateralized and not an investment requiring disclosure by Hill. He also testified that he had then a well-founded opinion that the borrowers could repay the loan and that no special loss reserves were required to back up the loan.[17]

There was also a highly unusual in camera proceeding involving another important government witness. One of the major allegations regarding the bank fraud was that these defendants conspired to avoid the restrictions on loans to "one borrower" by arranging for some of the Vision Banc loans to go to companies controlled by Adkinson, but with "sham" owners. There being no competent

---

[17] He also admitted that he had been fired from Peat Marwick, and was not retired as he had been represented at trial by the government, and that he was paid by Peat Marwick to prepare his trial testimony, a fact not revealed at the time to defendants.

documentary evidence showing any common ownerships between the corporate entities receiving the loans,[18] the government offered the testimony of Barney Van Huss that he had merely posed as the owner of one of the corporations so that it could receive loan monies as an arm's-length participant in the transactions. The difficulty with this testimony was that Van Huss had on numerous previous occasions, under oath, claimed just the opposite. In order to buttress his testimony in this trial, the district court allowed him to explain that his prior statements that he owned the corporation were lies made because of threats to him and his family, but that his present testimony was the truth because there were no more threats. The defense, however, learned almost a year later that the court, in an in camera procedure requested by the government four days after the beginning of this trial, had granted Van Huss permission to carry a shotgun because of alleged threats.

After five months of trial, nine defendants were convicted on various counts.[19] Several defendants moved for a new trial, alleging juror misconduct in

_____

[18]In fact, a substantial amount of documentary evidence and testimony was to the contrary.

[19]Adkinson, Collins, Peek, Koshkin, and Alligood were convicted on Count I. Adkinson, Collins, Peek, Tinsley, Minks and Koshkin were convicted on Count II--defrauding Hill. All those convicted on Count II, plus Kistler and Dufilho, were convicted on Count III-defrauding Vision Banc. Convicted of Count VI, wire fraud, were Adkinson, Collins, and Minks. Adkinson and Collins were convicted on Counts VIII, interstate transportation of stolen property, and

discussing the defendants' alleged threats to witnesses. They also argued that the in camera proceeding which resulted in the government's witness being allowed to carry a gun, which they only learned about after trial, was *Brady* and *Jencks* material.[20] They asserted prosecutorial misconduct in that the government knew or should have known of the perjury by Sundheim and Van Huss (and other) witnesses. The denial of this motion is appealed.[21]

Defendants raise some seventeen issues on direct appeal. First and foremost, they challenge the fundamental fairness of their trial. They assert the failure to dismiss the bank fraud conspiracy from Count I before trial was error and led to the erroneous admission of extensive evidence which confused and misled the jury.

---

IX, mail fraud. Collins was convicted of money laundering as charged in Count XIII. The remaining counts were either dismissed or no convictions were obtained. Count VII was dismissed upon motion of the government. No one was convicted on Counts IV, V, X, XI, XIV, and XV.

[20]Defendants claim that the grant of permission to a "felon" was an inducement to testify favorably for the government which they had a right to know. Defendants also argue that had they known about the in camera proceeding, they could have discredited Van Huss' testimony that he was no longer lying because there were no current threats.

[21]No evidentiary hearing was held on the issues of juror and prosecutorial misconduct. *See United States v. Harris*, 908 F.2d 728, 733 (11th Cir. 1990) (failure to hold evidentiary hearing into juror misconduct constitutes abuse of discretion and reversible error). The appeal of the denial of the motion for a new trial was consolidated with the direct appeal. Our judgment of reversal of all convictions renders moot the motion for a new trial.

They also allege prejudicial joinder, prosecutorial misconduct,[22] and challenge the sufficiency of Counts II, III, VI, IX, VIII and XIII of the Indictment. We address the issues addressed to the Indictment first.

## V. Count I

Defendants assert that the district court's refusal to dismiss the allegations of a bank fraud conspiracy from Count I before trial was reversible error. We need not decide this issue,[23] however, because the initial inclusion of these allegations,

---

[22]Defendants argue that the government knew it should file in camera its inflammatory allegations concerning defendants' alleged threats to kill witnesses, but deliberately filed them openly. They also allege that the government induced the favorable Van Huss testimony in this case by supporting his request to carry a shotgun.

[23]*But see United State v. Cure*, 804 F.2d 625, 627 (11th Cir. 1986) (a district court is *required* to dismiss an indictment if it does not state a prosecutable offense)(emphasis added)(citing *United States v. Coia*, 719 F.2d 1120, 1123 (11th Cir. 1983)("It is perfectly proper, and in fact *mandated,* that the district court dismiss an indictment if the indictment fails to allege facts which constitute a prosecutable offense."(emphasis added)). *See also United States v. Polychron*, 841 F.2d 833 (8th Cir. 1988); *United States v. Finn*, 919 F. Supp. 1305, 1339 (D. Minn. 1995); *United States v. Lebron*, 704 F. Supp. 332 (D.P.R. 1989); *United States v. Was*, 684 F. Supp. 350, 351 (D. Conn. 1988); *United States v. Cogswell*, 637 F. Supp. 295, 296 (N.D. Cal. 1985). In order to be valid, an indictment must allege that the defendants performed acts which, if proven, constitute the violation of law for which they are charged. *Polychron*, 841 F.2d at 833. An indictment should be tested against the law "as we find it on the date of our decision." *United States v. City of Philadelphia*, 644 F.2d 187, 192 n.3 (3d Cir. 1980). "Judicial precedence serves as the foundation of our federal judicial system. Adherence to it results in stability and

22

coupled with their subsequent dismissal after the government's case created a unique set of circumstances[24] which rendered the trial of Count I fundamentally unfair and denied these defendants due process of law.

The allegations of a conspiracy to defraud the banks were insufficient to sustain a conviction under Section 371 during the entire course of this trial, but they were dismissed only *after the government concluded its case*. In permitting the government to try the case for four months as a bank fraud conspiracy, the district court allowed the introduction of an enormous amount of evidence under rules applicable only to conspiracies. The court made four months of evidentiary rulings based upon the government's assurances that all the 17,500 pages of testimony and 1447 documents[25] were inextricably intertwined because of the far-flung conspiracy to defraud the banks.[26] *See United States v. Ripinsky*, 109 F. 3d 1436, 1442 (9th Cir.

---

predictability." *Jaffree v. Wallace*, 705 F.2d 1526, 1533 (11th Cir. 1983).

The announcement of an en banc rehearing by a court of appeals does not suspend *stare decisis*. The disorder that resulted in this trial is testament to the wisdom of that rule.

[24]We can find no other case in which such a sequence of events occurred.

[25]The government's assurances extended only to its own witnesses and documents, of course.

[26]The government argues that no irrelevant evidence was introduced because it was all relevant to the substantive bank fraud charges. This is not so. The jury was exposed to four

1997) (Rule 404 does not prevent admission of evidence of other bad acts where they are inextricably intertwined with the ongoing conspiracy and scheme to defraud banks). Moreover, as all defendants were charged with the bank fraud conspiracy, all the evidence came in against each and every defendant regardless of when their participation in the scheme was alleged to begin or end.

We recall the prophecy of the district court upon initial consideration of defendants' motion to dismiss:

> [I]f we treat [the motion to dismiss] as not having been granted and *the evidence is admitted as if all those other purposes were part of the conspiracy* and . . . *Hope* is still the law, I think we've got an almost virtual certainty for a *mistrial.*

We agree. Mountains of details relevant only tangentially, if at all, to the ultimately charged scheme to defraud the IRS certainly must have confused the jury. Furthermore, under the circumstances of this case, this evidence obviously

---

months of extremely prejudicial evidence relevant only to the much broader conspiratorial scheme charted in the original indictment, including enormous amounts of evidence about the St. Joe Paper Company negotiations, the relationships between the various business entities involved in the alleged conspiracy, the absence of funds in the earnest money accounts for the land purchase, the political "bribes," the alleged coercion of an employee of Adkinson to perjure himself in a lawsuit between DGI and a wholly unrelated bank, Adkinson's purchase of a gun collection, post-closing efforts to sell the property, efforts to remove documents from the country to obstruct the Hill investigation, and the ultimate failure of the banks and savings and loans.

24

invited the jury to convict for conduct not, ultimately, even alleged to be a crime.[27]

The defendants' objections to this evidence were overruled upon the government's "inextricably intertwined" theory.  Before the dismissal of the improper objectives, however, it was impossible to rule correctly since no one knew with what charges the evidence was "intertwined." After the deletion of objectives 2-5, it was clear that much of the evidence was not "intertwined" since the bank fraud conspiracy had been dismissed.[28]

Then, after all this evidence was in the record, the government conceded, as, of course, it had known all along, that the allegations of a  bank fraud conspiracy did not violate Section 371 under the law of this circuit, and would have to be dismissed.  But the government's evidence remained in; none was stricken.[29] There

---

[27]The district court itself commented at sentencing, "I keep asking myself . . . what specifically--what specifically is illegal?  If you look at it bit by bit, it really is hard to do that."

[28]Examples of prejudicial evidence unrelated to any scheme to defraud the IRS but which was admitted as "inextricably intertwined" are: the testimony concerning alleged misdealing in relation to the payment of real estate commissions; land price manipulation; kick backs out of the loan proceeds; political payoffs via improper political contributions; check kiting.

[29]Ironically, had the district court continued on its course of allowing objects 2-5 to remain in the Indictment, it would have avoided the prejudice which resulted from proceeding to trial on the bank fraud conspiracy only to have it dismissed after the government's evidence was in. *But see* note 10 supra.

25

was no instruction to the jury to disregard any of it. If this strategy is sanctioned, the rules of evidence provide little protection against conviction by inadmissible evidence. *See United States v. Turquitt*, 557 F.2d 464, 468 (5th Cir. 1977) (evidence which shows or tends to show commission of crimes not charged is inadmissible in a trial for a particular crime); *United States v. Castell*, 584 F.2d 87, 89 (5th Cir. 1978) (Judge O'Kelly, in excluding evidence from a trial on charges of interstate transportation of stolen goods, commented that ". . . you would have thought we were trying either a drunken driving case or an interstate transportation of women for immoral purposes rather than what were trying, if you had listened to the evidence in the courtroom."); *United States v. Broadway*, 477 F.2d 991, 993 (5th Cir. 1973) (extraneous evidence may severely prejudice the defendant by the confusion of issues).

A most damaging prejudice was to the ability of these defendants to mount a coherent defense. Defendants were forced to defend themselves against charges which were not offenses under the prevailing law. They made decisions about cross-examination, whether to testify and to object, and how to explain the case to the jury without knowing what the ultimate charges would be. Defendants asked the court for a ruling on whether they had to defend against charges that they

actively conspired to defraud institutions other than the federal government, and the court answered "maybe." The court continued to give this answer for the next four months during the government's case. Only at the end of the government's case, with all of its evidence in, did the court grant the motion to dismiss the improper conspiracy from the Indictment. Nothing that had occurred during the trial affected this ruling; the outcome was the same as it would have been had it been made before trial. The only difference was that it was only at this point that these defendants knew the charges against them.[30]

The "inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Doggett v. United States*, 505 U.S. 647, 654 (1992) (quoting *Barker v. Wingo*, 407 U.S. 514, 532 (1972)). "An indictment must sufficiently warn the defendant of the charges against him so that he may adequately prepare his defense." *United States v. Alford*, 516 F.2d 941, 945 (5th Cir. 1975). In this case, the defense was put in the position of both defending against, and not defending against, the central conspiracy charges -– precisely what the

---

[30]This is not a case where perfectly proper charges are ultimately found by the court not to be supported by the evidence at trial and acquittals are entered. In that case, defendants know the charges from the beginning. They defend against those charges. The fact that they prevail on the evidence entitles them to be acquitted. *See Salinger v. United States*, 272 U.S. 542, 548-49 (1926) (withdrawing part of a charge from the jury's consideration does not work an amendment of the indictment).

right to indictment was meant to prevent. *Id.* Like an indictment which fails to allege an essential element, the district court's failure to rule on the motion to dismiss the improper objectives from Count I forced the defendants to go to trial with the chief issue undefined. After a trial which had as its centerpiece allegations that the defendants conspired to defraud Hill and Vision Banc, the district court decided that was not what the trial had been about after all. After the trial, the court determined that the only conspiracy upon which convictions lawfully could have been based all long was the tax conspiracy.

Ill-defined charges leave "the prosecution free to roam at large -- to shift its theory of criminality so as to take advantage of each passing vicissitude of the trial and appeal." *See Russell v. United States*, 369 U.S. 749,768 (1962). For example, the government was permitted to put in extensive evidence regarding the subsequent failure of Hill, Vision Banc, West Belt and other banks and S& L's in support of its conspiracy allegations. This evidence was not only ultimately irrelevant, but improper since it might have misled the jury into thinking that these defendants were on trial for causing these banks' ultimate failure. *See United States v. Wicker*, 933 F.2d 284, 290 (5th Cir. 1991) (failure of bank irrelevant to bank fraud charge).

Furthermore, the merits of defendants' motions for severance would have been substantial if the bank fraud conspiracy had been dismissed prior to trial. Tinsley, Kistler, and Dufilho are not even named in the tax conspiracy.[31] Kistler and Dufilho had no dealings with Hill. The initial motions for severance were denied predicated upon the government's bank fraud conspiracy theory. If this conspiracy had been dismissed pre-trial, severance of these defendants into two or more smaller cases would likely have been required since the prejudice to them of being joined when they were charged with no conspiratorial objectives was substantial. *See Kotteakos v. United States*, 328 U.S. 750, 775 (1946) (error to deny substantial right not to be tried en masse for a conglomeration of distinct and separate offenses committed by others).

At the conclusion of the government's case in chief when the bank fraud conspiracy was dismissed, defendants again moved for severance based upon prejudicial misjoinder. The court denied these motions.

Generally, misjoinder will not be found after dismissal of a count in an indictment during trial. *See United States v. Ong*, 541 F.2d 331, 337 (2d Cir. 1976).

---

[31]Early in the trial, the court instructed the jury that evidence of the tax conspiracy was not applicable to these defendants. Upon the objection of co-defendant Morgan, the court discontinued this practice.

This rule is inapplicable where the count justifying the joinder was not alleged by the government in good faith, i.e., with the reasonable expectation that sufficient proof will be forthcoming at trial. *Id. See also United States v. Aiken,* 373 F.2d 294, 299 (2d Cir. 1967). Since the government in this case knew at the time the Indictment was obtained that no amount of evidence at trial would be sufficient to convict defendants of a Section 371 bank fraud conspiracy, these defendants were misjoined insofar as the joinder was predicated upon that conspiracy. *Id.*

This misjoinder was not harmless. In a trial of this duration and size, guilt by association is always a threat. *Kotteakos*, 328 U.S. at 762. The only way all of these defendants were tied together at all in this far-flung series of events was by the allegation of a violation of Section 371 through a bank fraud conspiracy which no amount of evidence at trial could establish. Prejudice resulted from the spillover effect of the massive amount of testimony and exhibits which came in against all

defendants under the "inextricably intertwined" theory.[32]  This is bad faith joinder and was seriously prejudicial to these defendants.[33]

The circumstances underlying the trial of Count I were fundamentally unfair. With full knowledge that it was contrary to recent and controlling precedent, the government induced the grand jury to charge these defendants in Count I with a violation of Section 371 through a bank fraud conspiracy.  Fourteen defendants alleged to be participants in this massive conspiracy were joined.  Then after the close of the government's case, having had the benefit of evidentiary and severance rulings predicated upon the charge of a bank fraud conspiracy, the government

---

[32]At sentencing, Tinsley repeatedly stressed that the government had totally failed to articulate a single act on Tinsley's part that was criminal.  The court responded:

> . . . the difficulty is, when you start coming down to the specifics and trying to say, "Well, what did you actually do?"  The government has tried to do that, but they haven't been very successful in pointing out specific behavior that constitutes a crime.  In the aggregate, there was wrongdoing in this case.  I think that is what the jury sensed, and that's how they went about analyzing it, and that's how I viewed it.  In the aggregate, there was certainly wrongdoing.

[33]Whether the tax conspiracy alone can support the joinder of all these defendants is an issue that has never been addressed or resolved in this case.  We do not address it now except to note that the tax conspiracy requires proof that the conspirators knew they were in a common plan to impede the functions of the IRS. *United States v. Klein*, 247 F.2d 908 (2d Cir.1957).

31

conceded that it should never have been part of the case. This course of conduct does not display good faith. *See Ong*, 541 F.2d at 347. The resulting prejudice to these defendants affected their substantial rights and denied them due process of law. We shall reverse all convictions on Count I.[34]

## VI. Counts II and III

Defendants also challenge their convictions on Counts II and III, [35] alleging that these counts are defective for two reasons: first, the counts fail to allege "execution" of the bank fraud; and, second, Counts II and III are unsupported by allegations of an underlying bank fraud "scheme." Both of these claims have merit. 18 U.S.C. §1344 requires allegation and proof of both a scheme and an execution of the scheme to sustain a conviction for bank fraud. In this case, the execution of any scheme was never alleged, and the description of the scheme itself was redacted away –- consigned to the ash can.[36]

1. <u>Execution</u>

---

[34]The prejudice to defendants from the handling of Count I undoubtedly spilled over to affect the trial as to Counts II and III as well.

[35]All defendants were convicted of one or both of these counts.

[36]See Section "2" below.

Counts II and III of this Indictment never allege that these defendants actually executed a bank fraud scheme. Instead, these counts omit this essential element of the offense and charge incorrectly that the offense of bank fraud was and can be committed through "devising or intending to devise"a scheme to defraud. *See United States v. Lemons*, 941 F.2d 309, 318 (5th Cir. 1991) (bank fraud statute imposes punishment only for each execution of the scheme).[37] When the case was submitted and the jury charged, they were instructed by the judge no less than five times that the charges against the defendants were those set forth in the Indictment. Although the court did read an instruction to the jury containing the execution element of bank fraud, the Indictment was then given to the jury for their

---

[37]An indictment need do little more than track the language of the statute charged to be sufficient. *United States v. Stavroulakis*, 952 F.2d 686, 693(2nd Cir. 1992). This Indictment does not even do that. A count does not state an offense if it does not contain *all* the elements of the offense charged. *Hamling v. United States*, 418 U.S. 87 (1974); *United States v. Chesney*, 10 F.3d 641 (9th Cir. 1993); *United States v. Ramos*, 666 F.2d 469, 474 (11th Cir. 1982) (an indictment is generally constitutionally sufficient if it sets forth the offense in the words of the statute itself, as long as those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, *set forth all the elements necessary to constitute an offense* under the laws of the United States.") (emphasis added). The failure to allege the element which establishes the very illegality of the behavior and the court's jurisdiction is fatal to the indictment. *Russell v. United States*, 369 U.S. 749 (1962); *United States v. Cina,* 699 F.2d 853, 859 (7th Cir. 1983).

33

deliberations. Counts II and III told the jury that the defendants were guilty if they

"devised or intended to devise" a scheme to defraud the banks. We have held:

> "[A] general verdict must be set aside if the jury was instructed that
> it could rely on any of two or more independent grounds, and one of
> those grounds is insufficient, because the verdict may have rested
> exclusively on the insufficient ground."

*United States v. Elkins*, 885 F.2d 775, 782 (11th Cir. 1989) (quoting *Zant,* 462 U.S.

at 881. *Accord United States v. Ochs*, 842 F.2d 515 (1st Cir. 1988). These counts

invited the jury to convict for conduct not an offense.

Even if the failure to allege an execution is not fatal,[38] however, Counts II

and III suffer from an even more serious deficiency which is the direct result of the

"high-risk" strategy urged upon the court by the government.

## 2. The Scheme

The Indictment which ultimately charged these defendants contains no

description of the bank fraud scheme they were alleged to have perpetrated. Count

II charges that defendants devised a scheme to defraud Hill; Count III charges that

defendants devised a scheme to defraud Vision Banc. Originally, a scheme to

---

[38]The Fifth Circuit has held that the failure to allege an execution is not fatal to an indictment if the indictment "fairly imports all the elements" of the offense. *United States v. Blackburn*, 9 F.3d 353, 357 (5th Cir. 1993). We need not consider whether this indictment fairly imports all the elements vis-à-vis execution because we find these counts fatal for failure to allege a scheme.

defraud Hill and Vision Banc had been described in Count I and incorporated by reference into Counts II and III. Count I's introductory section alleged the bank fraud conspiracy, and then it was divided into Sections A-E. Section A, headed "Scheme," described a broad conspiracy to defraud Hill and Vision Banc. Section B briefly described the St. Joe property. Section C, "Defendants, Entities and Other Persons," identified fifty-four individuals and institutions in the case and described how they were alleged to fit into the conspiracy. Section D set forth the "Manners and Means by Which the Conspiracy was Carried Out," in thirty-six paragraphs describing the conspiratorial scheme. Finally, Section E, the "Overt Acts" section, recited 227 discrete overt acts which were said to be part of and pursuant to the conspiracy but with no explanation of how they fit into the alleged scheme.

The dismissal of the bank fraud conspiracy from the introductory section of Count I led the district court to redact the Indictment by eliminating all description of that conspiracy from the rest of the count. Of the forty-eight pages originally describing the scheme in Count I, there remains a single paragraph describing a scheme to evade taxes on fraudulently obtained money. All allegations of the bank fraud scheme were removed from Section A, the "Scheme." Twenty-nine of the original thirty-six paragraphs in Section D's "Manner and Means" were removed.

The seven remaining paragraphs charged only a narrow scheme to distribute and conceal the proceeds of the Vision Banc loans.[39] Hill was no longer even mentioned. Vision Banc is mentioned, but the "new" indictment essentially picks up the story *after* the funds have been obtained from Vision Banc and focuses on their distribution and concealment from IRS.[40] The complete elimination of the

---

[39]These paragraphs state only that it was part of the conspiracy: (1) to defeat the lawful functions of the IRS by concealing the $20.4 million obtained from Vision Banc; (2) to arrange the various transactions to give the appearance they were arm's-length; (3) to fraudulently distribute the Vision Banc proceeds; (4) transmit the Vision Banc proceeds to Imperial Title and then disburse them to Adkinson, Alligood and Ferguson; (5) to conceal the diversion of Vision Banc proceeds; (6) for the corporate entities to fail to file, or to file false, tax returns with regard to the Vision Banc proceeds; and (7) for Adkinson and Koshkin to fail to file, and for Alligood and Collins to file false, tax returns with regard to the Vision Banc proceeds.

[40]There was much discussion between the court, the government, and the defendants about whether and how to redact the indictment. There were two fundamental problems created by elimination of the improper bank fraud objectives from Count I. First, the allegations of a scheme to defraud the banks were so pervasive that complete elimination of them would eviscerate the Indictment, leaving great gaps in the written document as well as the government's case. Second, the Indictment was organized so that all the substantive counts, which were supported by the existing law, depended for their context on the allegations of a conspiracy to defraud the banks. If these allegations were redacted, the substantive counts of mail and wire fraud, as well as interstate transportation of money obtained by fraud and money laundering would be in furtherance of no underlying scheme. The court, government and the defendants could not agree on a satisfactory solution. Ultimately, the court elected to redact the Indictment, and to do so extensively--more extensively, in fact, than any party requested.

bank fraud scheme from Count I left Counts II and III with no scheme to be incorporated by reference.

A redaction of an indictment is permissible so long as the elements of the offense charged are fully and clearly set out in what remains. *United States v. Miller*, 471 U.S. 130, 136 (1985); *United States v. Bissell*, 866 F.2ds 1343, 1356 (11th Cir. 1989). An indictment may not, however, be so severely redacted that any of the elements of the offense are expunged. *United States v. Doherty*, 867 F.2d 47, 55 (1st Cir. 1989).

The allegation of a scheme is an essential element of the offense of bank fraud. 18 U.S.C. § 1344. *United States v. Hess*, 124 U.S. 483, 488-89 (1888).[41] In *Hess*, the Supreme Court held:

---

After the court finally dismissed the bank fraud allegations from Count I, it observed, "The nature of the case, certainly the complexion of the case is quite different once you take out the real guts of the conspiracy charge, which is really what the case is all about."

Defendants agreed and objected to the redacted indictment. Counsel for Collins and Minks argued, "[i]t's now no longer the Indictment even that the grand jury returned." See Appendix A, the Redacted Indictment.

[41]The bank fraud statute was modeled on the mail and wire fraud statutes and, where it dovetails with those statutes, we look to precedents arising under those statutes to inform our interpretation of such amorphous phrases as "scheme to defraud." *Stavroulakis,* 952 F.2d at 694.

The essential requirement, indeed, all the particulars constituting the offense of devising a scheme to defraud, are wanting. Such particulars are matters of substance, and not of form, and their omission is not aided or cured by the verdict.

*See also United States v Goldsmith*, 109 F.3d 714, 715 (11th Cir. 1997) (bank fraud statute requires the government to establish that a scheme existed in order to obtain money from the bank); *United States v. Stavroulakis*, 952 F.2d 686, 694 (9th Cir. 1992) (bank fraud statute makes an individual criminally culpable for devising and executing or attempting to execute a scheme with the intent to defraud a bank).

After the redaction of this Indictment, the target of the scheme set forth in Count I is the IRS. Hill is not mentioned at all. Nor does a fair reading of the redacted Indictment adequately describe how the Vision Banc loans were fraudulently procured or even that the Vision Banc was a target of fraud in any way.

Government counsel now argues that the missing scheme to defraud the banks can be located among the 227 overt acts remaining in Count I. The overt acts, however, are there to support the allegations of a conspiracy, not to describe an alleged scheme to defraud. *United States v. Mercer*, 133 F. Supp. 288, 290-91 (N.D. Cal. 1955) (indictment charging defendant with wire fraud supported only by overt acts and no particulars of the scheme insufficient).

38

Furthermore, the overt acts describe no coherent scheme. In the original Indictment, the overt acts were put into context by the detailed descriptions of the scheme contained in Parts A, C, D and the introductory section of Count I. When the court redacted all of these sections except as they related to the narrow tax scheme, it left the overt acts without context. Standing alone, they do not indicate the nature of the scheme to defraud, and so cannot supply the missing allegations of a scheme or artifice to defraud the banks. *See Mercer*, 133 F. Supp. at 290. ("Even if the overt acts charged in count one were to be considered, they do not indicate the nature of the scheme to defraud.").

Finally, even if the overt acts could supply the missing "scheme," the jury, having no description of a bank fraud scheme, was left free to pick and choose that "scheme" from wherever they wished among the 227 overt acts. Under such circumstances, the probability that the resulting verdict was not unanimous would be overwhelming. For example, Juror A may have located the scheme in overt acts 1-10, while Juror B found the scheme in acts 2-20 only. Although both voted to convict, they had different schemes in mind.

Therefore, even if the overt acts could supply the missing scheme, the failure of the jury to unanimously agree on which of the 227 overt acts constituted the scheme would violate these defendants' right to a unanimous verdict. *United States*

*v. Gipson*, 553 F.2d 453, 458 (5ᵗʰ Cir. 1977) In *Gipson*, the Fifth Circuit reversed a conviction where the jurors were instructed that they could convict the defendant if they found that he had performed any of the six acts prohibited by the statute. The court held that such an instruction violated the defendant's constitutional right to a unanimous verdict since it authorized a guilty verdict despite the fact that some jurors may have believed that the defendant had committed certain of the acts, while other jurors were convinced that he committed different ones of the prohibited acts. *Id.* The court wrote that "[r]equiring the vote of twelve jurors to convict a defendant does little to insure that his right to a unanimous verdict is protected unless this prerequisite of jury consensus as to the defendant's course of action is also required." *Id.* *See also United States v. Grandlund*, 663 F.2d 534, 544 (5ᵗʰ Cir. Unit B 1981) (conviction reversed where impossible to tell if jurors agreed that defendant committed same act which could properly support conviction for mail fraud and conspiracy).

Although defendants' did not request a more specific jury instruction,[42] after having redacted away the scheme, the failure of the district court to instruct the jury that they must unanimously agree on the acts constituting defendants' scheme was

---

[42]The district court instructed only that "Now, any verdict you reach in the jury room, whether it's guilty or not guilty, must be unanimous."

plain error. *See Gipson*, 553 F.2d at 458. Therefore, even if the missing scheme could be located among the 227 overt acts as the government now argues, we would reverse the convictions on Counts II and III for violation of these defendants' substantial right to a unanimous verdict.

In summary, the failure of Counts II and III to sufficiently allege the underlying scheme to defraud Hill and Vision Banc respectively is fatal.[43] To the extent that the overt acts allege any scheme, the defendants' right to jury unanimity as to this scheme was unconstitutionally impaired. *See United States v. Huls,* 841 F.2d 109, 112 (5th Cir. 1988) (reversal required where indictment fails to allege essential element of the offense). All convictions on these counts will be reversed.

## VII. Counts VI, VIII, IX and XIII

We hold that under the circumstances described above, defendants' convictions on these counts must be reversed. All of these offenses require allegations of an underlying scheme. *See* 18 U.S.C. §§ 1341 and 1343; *Hess*, 124 U.S. at 488-489 (mail and wire fraud); *United States v. Ferrara*, 571 F.2d 428, 429-

---

[43]In similar circumstances, a district court upon remand stated, "It is noted that the government must modify the redacted version of the indictment. The redacted version does not contain the Count 2 allegations of a scheme to defraud that the remaining mail and wire fraud counts refer to as being incorporated by reference. The scheme allegations should be included in the redacted indictment." *United States v. Bailin*, 816 F. Supp. 1269, 1272 n. 4 (N.D. Ill. 1993).

30 (8th Cir. 1978) (offense of interstate transportation of money taken by fraud is meant "to reach the fraudulent scheme whereby the criminal is the efficient cause of the interstate transportation"); *United States v. Alford*, 999 F.2d 818, 830 (5th Cir. 1993) (essential element of the money laundering count is that proceeds of financial transactions represent proceeds of specified unlawful activity); *United States v. Restivo*, 8 F.3d 274, 279 (5th Cir. 1993) (defendant charged with, as an essential element of the money laundering counts, conducting financial transactions with the intent to promote the specified unlawful activity of bank fraud). These counts originally incorporated by reference the description of the bank fraud scheme found in Count I. The redaction completely eliminated this scheme. The counts, therefore, all must be reversed for failure to allege an essential element of these offenses.

## VIII. Sufficiency of the Evidence

As already apparent, the case has presented troublesome issues often difficult to grasp. We come now to another.

We must, as seen, remand the case for further proceedings generally expected to include retrials under more traditional and less gambling processes. Yet, we have not decided which of the defendants remain exposed to trial. Strenuous argument is advanced by and on behalf of each that, in the trial from

which this appeal is taken, there was insufficient evidence to support verdicts of guilt.[44]

Adjudicating such claims is not usually of great difficulty. It can be tedious. Citations to transcripts of witnesses' testimony and to exhibits are required, but ought not be hard to do. Here, however, we encounter well-nigh insurmountable difficulties.

The government's brief is supposed to refer us to volume and page of transcribed testimony where, it is said, we shall find evidence sufficient to support these convictions. There are some such references. However, the government's brief incorporates a novel citation scheme. Instead of advising the reader where certain testimony can be found in the record, the brief identifies witnesses and

---

[44]In ruling on the defendants' motions for judgments of acquittal, the district court commented:

> [T]here's been some serious doubt in my mind as to what really has been established by the government in connection with the stated purpose of the remaining portion of the conspiracy. In truth, there really has not been much evidence that there was a conspiracy to conspire or frustrate the IRS function in this case. . . .
>     Part of the problem is that the government has attempted to turn a bank fraud case into a case that includes an income tax case and a mail fraud case, and everything else, and the pieces simply don't fit together very well.

The district court went on, however, to uphold the convictions.

volumes of transcript, advising the court that, if the court peruses *all* the testimony, some support for the proposition advanced might be found!  Instead of identifying pages upon which the contended proof is found, the brief says "<u>passim</u>"!  Thus, the first such record reference, found on page 10 of the government's brief reads, "Manuscalco R95: passim."  (On that page, there are five more such references.)

These invitations to us to read entire volumes of transcript on the chance that we shall discover the testimony upon which the prosecutor relies are not merely occasional.  From page ten through page thirty-nine of the government's brief, we count no less than eighty-three (83) such references!  Eliminating duplications, we count forty volumes of record transcripts called to our attention followed by the Latin word "passim" ("everywhere").  Apparently, the United States Attorney depends on us to search through these volumes looking for what we believe the government proffers as supporting evidence on the fact issue being discussed.

We shall not undertake to do this.  Appellants say that they cannot find testimony tending to prove guilt in these volumes.  Perhaps they have overlooked something.  Left to sift through the pages by ourselves, unguided by an advocate, we might overlook it, too.  The government allocates too much advocacy to the court.  To guard against this sort of happening, the court fashioned a rule:

44

In the statement of the case, as in all other sections of the brief, every assertion regarding matter in the record shall be supported by a reference to the volume, document number and page number of the original record where the matter relied upon is to be found.

11th Cir. R. 28-2 (1).[45]

Why is compliance important? Our opinion thus far makes it clear that the court will not allow these convictions to stand. However, upon remand, new trials might be conducted.[46] Yet, if, in the trial here under review the government failed to present sufficient evidence to support a conviction of any one of the appellants, that defendant may not be placed in further jeopardy by a new trial.[47] We must,

---

[45]It should also be noted that the Clerk of Court for the Eleventh Circuit sends every party notice of the rule upon the filing of the appeal. Government counsel admitted he was aware of the rule, that his record references violated it, and that the Eleventh Circuit in a recent case had chastised another attorney for a similar failure to follow the rule. *See Freund v. Butterworth*, 117 F.3d 1543,1569 n.60 (11th Cir. 1997). *See also* F.R.A.P. 28(e).

[46]Double jeopardy prevents retrial on the acquitted bank fraud conspiracy theory. See *Richardson v. United States*, 468 U.S. 317, 325(1984)(". . . the protection of the double jeopardy clause by its own terms applies only if there has been some event, such as an acquittal, which terminates the original jeopardy."); *Price v. Georgia*, 398 U.S. 323, 329 (1970). All other convictions, though reversed for trial error, would be subject to retrial. *Montana v. Hall*, 481 U.S. 400 (1987). *See also United States v. Miller*, 952 F.2d 866, 872 (5th Cir. 1992) (no *double* jeopardy unless the original jeopardy has *terminated*; and it is abundantly clear that a reversal for [trial] error is no more a termination of jeopardy than a mistrial where the jury is unable to agree.")

[47]*Burks v. United States*, 437 U.S. 1 (1978).

therefore, determine whether or not there was sufficient evidence vis-à-vis each appellant.[48]  The government says that, as to each, there was sufficient evidence. Government counsel owes the court the duty of pointing it out.

Therefore, this appeal will remain in the breast of the court until further order or judgment.  A separate order will issue from the Clerk of Court directing compliance with Eleventh Circuit Rule 28-2 (i).

## IX.  Conclusion

The circumstances surrounding the allegations in Count I of a bank fraud conspiracy denied these defendants a fair trial on this count.  The convictions under Count I WILL BE REVERSED.  Counts II , III, VI, VIII, IX and XIII are insufficient as a matter of law for failure of the redacted Indictment to allege an essential element of these offenses and all WILL BE REVERSED. By separate order to the Clerk of Court, we DIRECT further documentation on the sufficiency

---

[48]Although not mandated by the double jeopardy clause, it is clearly the better practice for the appellate court on an initial appeal to dispose of any claim properly presented to it that the evidence at trial was legally insufficient to warrant the thus challenged conviction.  *Miller*, 952 F.2d at 874.  *Accord United States v. Szado*, 912 F.2d 390, 393 (9th Cir. 1990); *United States Quinn,* 901 F.2d 522, 529 n.5 (6th Cir. 1990); *United States v. Anderson*, 896 F.2d 1076,1078 (7th Cir. 1990).

of the evidence to sustain the convictions obtained in order to permit retrial upon remand. Therefore, the question of remand remains in the breast of the court.

ORDER WILL ISSUE BY CLERK OF COURT; JUDGMENT TO FOLLOW FURTHER PROCEEDINGS.

IN THE UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF FLORIDA

PENSACOLA DIVISION

UNITED STATES OF AMERICA,

v.                                          PCR 91-03052/RV

                                            SUPERSEDING

WILLIAM MICHAEL ADKINSON,                   INDICTMENT

KEITH ALAN COX,

ROBERT L. COLLINS,

ROBERT ALLIGOOD a/k/a BOB ALLIGOOD,

RONALD D. PEEK,

ROBERT E. BROCKMAN,

RICHARD A. TINSLEY,

DANIEL D. KISTLER,

BENJAMIN L. KOSHKIN,

ANN POWELL MINKS f/k/a ANN POWELL,

MARY CATHERINE FAWCETT,

GILBERT G. DUFILHO

_____/

THE GRAND JURY CHARGES:

At all times relevant to the indictment:

COUNT I

From on or about June 1,1985,and continuously thereafter up to and including the date of this indictment,in the Northern District of Florida,and elsewhere, WILLIAM MICHAEL ADKINSON, KEITH ALAN COX, ROBERT L. COLLINS, ROBERT ALLIGOOD a/k/a BOB ALLIGOOD, RONALD D. PEEK, ROBERT E.BROCKMAN,

BENJAMIN L. KOSHKIN, ANN POWELL MINKS f/k/a ANN POWELL

the defendants herein, willfully and knowingly did combine, conspire, confederate, and agree together and with one another andwith other individuals, both known and unknown to the grand jury, to accomplish the following:

The defendants, WILLIAM MICHAEL ADKINSON, KEITH ALAN COX, ROBERT L. COLLLINS, ROBERT ALLIGOOD a/k/a BOB ALLIGOOD, RONALD D. PEEK, ROBERT E. BROCKMAN, BENJAMIN L. KOSHKIN, ANN POWELL MINKS f/k/a ANN POWELL

conspired to defraud the United States by impeding, impairing, frustrating, obstructing, and defeating the lawful governmental functions of the Internal Revenue Services of the Treasury Department in the ascertainment, computation, assessment, and collection of the revenue of the United States; to wit: Federal income taxes of one or more persons or entities.

A. <u>Scheme</u>

As it relates to the tax conspiracy, the purpose of the conspiracy to impede and impair the Internal Revenue Service was to defraud the United States (1) by concealing and causing to be concealed income generated from the proceeds of certain false and fraudulent loan transactions, which proceeds were purportedly applied to real estate transactions but were in actuality diverted and distributed among a number of persons and entities and which proceeds constituted taxable income to the one or more persons or entities receiving and possessing said proceeds, and (b) by either failing to file federal income tax returns which if truthfully filed would have disclosed the existence of said income or by filing false tax returns that failed to report income derived from the proceeds of the false and fraudulent loans, all so as to impeded, impair, frustrate, obstruct and defeat the lawful governmental functions of the Internal Revenue Service in the ascertainment, assessment, collection and computation of revenue of the United States, to wit: federal income taxes of one or more persons or entities.

B. <u>Property</u>

The property is located south of Highway 98, east of Sandestin, and consists of approximately 21,000 acres of unimproved land in the Walton County, Florida, within the Northern District of Florida. The property is located on the south side of Highway 98, and runs adjacent to the Gulf of Mexico, and contains several miles of pristine beach-front land.

C. <u>Defendants, Entities and Other Persons</u>
[completely redacted, including the title]

**D.   Manner and Means by Which the Conspiracy was Carried Out**.

76

77

78

79

80

81

82

83

27. It was part of the unlawful conspiracy to impede, impair and defeat the lawful functions of the Internal Revenue Service to conceal or cause to be concealed income in the amount of approximately $20,400,000 obtained and received from Vision Banc Savings Association of Kingsville, Texas through sham loan transactions.

28. It was further part of the conspiracy to arrange purported real estate transactions that involved the creation of documentation to give the appearance of arms-length transactions, including the purchase by Walton County Investors, Inc. Of real estate from St.Joe Paper Company and a subsequent resale by Walton County Investors, Inc. Of certain parcels of such property to Robert Corson as Trustee; Crossview Development Company, Inc.; Development Mortgage Group, Inc.; Ferguson C & D, Inc.; and First Western Equity, Inc.

29. It was further part of the conspiracy to create fictitious and fraudulent commissions, feesand loans in connection with the false real estate transaction and to prepare and execute false documentation in furtherance thereof, so as to divert, misappropriate and distribute to certain persons and entities the income derived from the sham Vision Banc Savings Association loans and for all such persons and entities to conceal from the Internal Revenue Service the true income character of these misappropriated proceeds of the sham Vision Banc Savings Association loans.

30. It was further part of the conspiracy that the misappropriate proceeds of the Vision Banc Savings Association sham loans were transmitted directly to Imperial Title Company and thereafter disbursed to the benefit and gain of, <u>inter alios</u>, WILLIAM MICHAEL ADKINSON, ROBERT ALLIGOOD a/k/a BOB ALLIGOOD, The Development Group, Inc. and Sandsend Financial Consultants, Ltd.

31. It was further part of the conspiracy that the aforementioned diversion of the Vision Banc Savings Association sham loan proceeds was concealed through the use of shell corporations, nominees and fraudulent loan transactions.

32. It was further part of the conspiracy that all of the corporate entities that received or transmitted any of the income generated by the sham Vision Banc Savings Associationloan proceeds either (a) failed entirely to file federal tax returns, including Development Group, Inc.; Walton County Investors, Inc.; Sandsend Financial Consultants Limited;Crossview Development Company, Inc. Development Mortgage Group, Inc.; Ferguson C & D, Inc.; and First Western Equity, Inc., or (b) filed false federal tax returns that failed to report receipt or possession of said income, including Reynolds, Smith& Hills and its subsidiary, Plantec Realty Company.

33. It was further part of said conspiracy that WILLIAM MICHAEL ADKINSON and BENJAMIN L. KOSHKIN did not file a federal

tax return in 1986 and both ROBERT ALLIGOOD a/k/a BOB ALLIGOOD and ROBERT L. COLLINS filed false federal tax returns that failed to report their receipt of income derived from the sham Vision Banc Savings Association loan proceeds.

### E. Overt Acts.

**THERE FOLLOW 50 UNREDACTED PAGES ASSERTING 227 OVERT ACTS SAID TO HAVE BEEN COMMITTED IN FURTHERANCE OF THE CONSPIRACY ORIGINALLY ALLEGED IN THE PAGES STRICKEN AND, POSSIBLY, IN FURTHERANCE OF OTHER CHARGED CONDUCT.**