UNITED STATES of America,
Plaintiff-Appellee,

v.

Felix RAMOS, Edward Marti, Renee Marti, Defendants-Appellants.

No. 80–5947.

United States Court of Appeals,
Eleventh Circuit.

Jan. 22, 1982.

Rehearing Denied March 8, 1982.

John L. Lipinski, Miami, Fla., for Ramos.

James P. Ryan, North Miami, Fla., for E. Marti and R. Marti.

Caroline Heck, Asst. U. S. Atty., Miami, Fla., for plaintiff-appellee.

Before FAY, ANDERSON and CLARK, Circuit Judges.

FAY, Circuit Judge:

On October 9, 1980, Eddy Hidalgo, Edward Marti, Renee Marti and Felix Ramos were convicted of drug violations stemming from their sale of approximately 80,000 tablets containing the controlled substance, diazepan.[1] Challenging, *inter alia*, the in-

---

1. The controlled substance, diazepan, is spelled differently in the trial transcript, parties' briefs and indictment. The trial transcript follows

dictment as vague, the conspiracy count as duplicitous and the evidence as insufficient, all of the above defendants save Hidalgo seek reversal. Ramos and the Martis will, no doubt, find our conclusions to be a bitter pill indeed: Having accorded the appellants the most careful consideration of their objections, we hereby affirm the conviction of each.

## I. The Scenario

We preface our analysis with a look at the pertinent facts adduced at trial:

At approximately noon on March 14, 1980 in Lum's Restaurant in southwest Miami, a confidential government informant introduced Agent Robert Mazzilli of the Drug Enforcement Administration (DEA) to Eddy Hidalgo. Hidalgo informed Mazzilli that he and "his people" wished to sell 200,000 "ludes," the vernacular term for methaqualone, often referred to as Quaaludes. R. 2 at 108–09. Hidalgo told the agent that for $100,000 he would be able to purchase 80,000 pills, at a price of $1.25 each. Agent Mazzilli then led Hidalgo outside to a parked undercover vehicle, where he was shown $100,000 in government funds. After the men returned to the restaurant, Hidalgo assured Agent Mazzilli that the "ludes" were "lemon 714's"[2] of excellent quality. R. 2 at 112. He suggested to the agent that following their initial deal, Hidalgo and "his people" could continue to supply Mazzilli with 80,000 pills every two weeks, at a reduced price. Hidalgo revealed that the source of his supply was a father and son team. R. 2 at 113.

Subsequent to their meeting at Lum's, the men separated. Agent Mazzilli returned to the DEA's Miami District Office; Hidalgo was followed by DEA surveillance agents to a Miami residence, outside of which Edward Marti was observed seated in a brown car watching the area closely.

At 1:45 p. m., Hidalgo contacted Mazzilli by telephone regarding the proposed drug sale. At 2:30 p. m., Mazzilli received another phone call from Hidalgo and a second individual who later identified himself as "the man...with the merchandise." R. 2 at 124. At 2:35 p. m., Hidalgo initiated yet a third telephone conversation with the agent, to finalize the delivery plans. All three telephone communications were recorded on cassette tape by Agent Mazzilli.

In accordance with their arrangements over the phone, Agent Mazzilli met Hidalgo and Edward Marti at 4:20 p. m. in the parking lot of a Burger King restaurant on 57th Street and 7th Avenue in southwest Miami. As Agent Mazzilli pulled into the lot, he observed both Hidalgo, who was vacuuming a white Pontiac Grand Prix car, and Marti, who was in a telephone booth placing a call, at an adjacent gas station. Hidalgo approached Agent Mazzilli, and the two men entered the restaurant. They were joined several minutes later by Edward Marti. Hidalgo introduced Mazzilli to Edward, who identified himself as the second individual with whom the agent had spoken on the phone earlier that day. Marti told Agent Mazzilli that for the past five years he had been bringing Quaalude tablets in lots of 100,000 to New York City, where he would sell them for $1.65 each. Marti then informed Mazzilli that he had just telephoned his source, who would be delivering the "ludes" momentarily. After pointing out to Mazzilli a blue late model Cadillac Coupe de Ville which was entering the parking lot, Marti introduced Mazzilli to its driver—later identified as his father, Rene Marti—whom Edward referred to as "his man." R. 2 at 138. The agent was then introduced to Felix Ramos, the operator of a red Gucci Cadillac which had followed the blue Cadillac into the lot. During a discussion with Hidalgo, Ramos and Edward Marti regarding the "ludes, stuff, merchandise, pills and tablets," R. 2 at 137,

---

the spelling "Diazopon;" the government refers to the drug as "diazepam;" the appellants mention variously "diazepan," "diazopon," "Diazapan," "Diazepon" and "diazapon." For the sake of consistency, we adopt the indictment's spelling: "diazepan."

**2.** "Lemon 714" is the known commercial firm and marking of Quaaludes, the tablets which contain methaqualone. R. 3 at 372.

Rene pointed to the trunk of the red Cadillac, indicating that the pills were inside. At Mazzilli's request, Ramos gave him the keys to the red car. As the operator of the blue car drove off, Mazzilli drove the red Cadillac in the opposite direction to a nearby U-Totem store. Hidalgo and Felix followed him there in the white Grand Prix. After their arrival in the U-Totem parking lot, Agent Mazzilli requested and received Ramos's permission to inspect the merchandise, consisting of 80,000 tablets located in the trunk of the red Cadillac. Agent Mazzilli looked into the trunk, where he saw the tablets in boxes. He signaled the surrounding agents, who immediately closed in on the three defendants and arrested them.

A forensic chemist identified the contents of each tablet as 78 milligrams of diazepan, a controlled substance which is frequently substituted for methaqualone and which constitutes the active ingredient in valium. R. 3 at 372. Each tablet bore the stamp, "lemon 714," which represents the firm and markings for Quaaludes. R. 2 at 372.

The following day, Edward's "man," the driver of the blue Cadillac, was arrested at his residence. He was identified as Edward's father, Rene Marti.

On March 21, 1980, a grand jury indicted the Martis, Ramos and Hidalgo for conspiring to possess with intent to distribute and to distribute methaqualone, in violation of 21 U.S.C. § 846, as well as for possession and distribution of diazepan, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Hidalgo and Edward Marti were additionally indicted for using a communication facility to commit a felony, in violation of 21 U.S.C. § 843(b).

The defendants' motions to dismiss the indictment were denied, and a jury convicted them as charged. Ramos and the Martis appeal from the denial of their motions to dismiss, as well as from their convictions, on a variety of grounds. We turn now to a separate examination of each.

## II. The Legal Challenge

### A. *Duplicity*

▮ The appellants join in seeking to strike as duplicitous the initial count of the indictment, which charges them with conspiring to possess and to distribute methaqualone. The error of duplicity is present where more than a single crime is charged in one count of an indictment. *See, e.g., United States v. Goodman*, 285 F.2d 378, 379–80 (5th Cir.), *cert. denied*, 366 U.S. 930, 81 S.Ct. 1651, 6 L.Ed.2d 389 (1961). Count One of the instant indictment charges but one crime—conspiracy—which has two goals—possession and distribution. The appellants claim that the charge of dual conspiratorial objectives renders Count One duplicitous. Prevailing legal principle, however, refutes their contentions. In the seminal case of *Braverman v. United States*, 317 U.S. 49, 63 S.Ct. 99, 87 L.Ed. 23 (1942), the Supreme Court of the United States cogently explicated what remains a firm tenet of our criminal law:

> The allegation in a single count of a conspiracy to commit several crimes is not duplicitous, for "The conspiracy is the crime, and that is one, however diverse its objects." *Frohwerk v. United States*, 249 U.S. 204, 210 [39 S.Ct. 249, 252, 63 L.Ed. 561]; *Ford v. United States*, 273 U.S. 593, 602 [47 S.Ct. 531, 534, 71 L.Ed. 793]; *United States v. Manton*, 107 F.2d 834, 838 [2nd Cir.] ... The single agreement is the prohibited conspiracy, and however diverse its objects it violates but a single statute ... For such a violation, only the single penalty prescribed by the statute can be imposed.

*Id.* at 54, 63 S.Ct. at 102. *See also United States v. Avila-Dominguez*, 610 F.2d 1266 (5th Cir. 1980).

By way of explanation, we note the distinction between the present indictment and that invalidated as duplicitous in *Siegel v. United States*, 484 F.Supp. 553 (S.D.Fla. 1980). Count One of the *Siegel* indictment charged conspiracy to import cocaine and marijuana. Since the accusation involved charges under two distinct statutes carrying separate penalties and involving different evidence, the count was stricken as duplicitous. Such is not the case here, where

the appellants were charged with and sentenced for violating one statute only, 21 U.S.C. § 846, and where the required proof was limited to a lone agreement among the members of one group to consummate a single transaction: the sale of methaqualone to Agent Mazzilli. No allegation was made nor evidence introduced which possibly could be construed to indicate the existence of more than one conspiracy. Given that the indictment properly charged a single illicit agreement under 21 U.S.C. § 846, the court finds the appellants' suggestion of duplicity totally without merit.

## B. *Sufficiency of the Indictment*

■ The appellants continue their attack on the indictment in toto, contending that it suffers from vagueness and lack of specificity. Clearly, the sixth amendment guarantees every defendant the right to be informed of the government's accusation against him. *Russell v. United States*, 369 U.S. 749, 761, 82 S.Ct. 1038, 1045, 8 L.Ed.2d 240 (1962). The prevailing test relied upon by courts seeking to safeguard this constitutional protection was articulated in *Hamling v. United States*, 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1942):

> [A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.

*Id.* at 117, 94 S.Ct. at 2907.

■ The appellants argue that the *Hamling* test is offended because the indictment states conclusions of law which merely track the statutes, failing to afford any statement of overt acts. The degree to which simple "tracking" of the pertinent statute is permissible depends on the language of the statute itself:

> It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as "those words of themselves fully, directly and expressly, without any uncertainty or ambiguity, set forth all the elements neces-

sary to constitute the offense intended to be punished." *United States v. Carll*, 105 U.S. 611, 612 [26 L.Ed. 1135] (1882).

*Id.* at 117, 94 S.Ct. at 2907.

■ The language under which the appellants here were indicted meets the requirements of clarity and certainty set forth above. *See, e.g., United States v. Goodman*, 605 F.2d 870 (5th Cir. 1979); *United States v. Mendoza*, 473 F.2d 692 (5th Cir. 1972) (tracking language of 21 U.S.C. § 841(a)(1) held sufficient); *United States v. Rodriguez*, 546 F.2d 302 (9th Cir. 1976), *United States v. Murray*, 492 F.2d 178 (9th Cir.), *cert. denied*, 419 U.S. 942, 95 S.Ct. 210, 42 L.Ed.2d 166 (1974) (indictment for violation of 21 U.S.C. § 843(b) need not allege exact date or precise location of telephone call); *United States v. Ferra*, 427 F.2d 1348 (5th Cir. 1970); *United States v. Doe*, 401 F.Supp. 63 (E.D.Wis.1975) (tracking of 18 U.S.C. § 2 upheld); *United States v. Martinez*, 496 F.2d 664 (5th Cir.), *reh. denied*, 503 F.2d 568, *cert. denied*, 419 U.S. 1051, 95 S.Ct. 627, 42 L.Ed.2d 646 (5th Cir. 1974) (indictment under 21 U.S.C. § 846 valid as long as contains all elements of offense). Hence, the indictment's tracking of the statutory language, supplemented by precise allegations of the time and place of the criminal activity, the names of the participants and the controlled substance involved, would appear entirely sufficient.

Nevertheless, the appellants challenge each count of the indictment as unduly vague with regard to the time and place of the purported offense. Their contention, however, is belied by Count One's explicit delineation of a two-day conspiracy commencing "on or about March 13, 1980 and continuing through March 14, 1980, at Miami, Dade County, in the Southern District of Florida" and by the remaining substantive counts' allegations that both the illicit drug transaction and the unlawful use of a telephone occurred on or about March 14, 1980 in Miami.

This specificity regarding the time and place of the appellants' offenses distinguishes their indictment from that labelled insufficient in *United States v. Cecil*, 608

F.2d 1294 (9th Cir. 1979). The indictment in *Cecil* stated only that the conspiracy occurred in "Arizona, Mexico and elsewhere, beginning on or before July, 1975 and continuing on or after October, 1975." *Id.* at 1295. Despite the appellants' attempt to analogize the two indictments, we find that theirs in no way parallels the one in *Cecil*: The time is limited to a named two-day period, while in *Cecil* it extended at least four·months; the place is limited to Miami, while in *Cecil* its occurrence spanned beyond one state and one foreign country.

■ The appellant further complains that Count One fails to allege any overt act in furtherance of the conspiracy. We observe that an indictment for conspiracy to commit a criminal offense need not be as specific as a substantive count. *Brown v. United States*, 403 F.2d 489 (5th Cir. 1968). Consequently, as the United States Magistrate noted in her order denying Edward Marti's motion to dismiss the indictment as unduly vague, the government need not allege or prove an overt act in a conspiracy prosecution such as this one brought under 21 U.S.C. § 846. *United States v. Juarez*, 573 F.2d 267 (5th Cir.) *cert. denied*, 439 U.S. 915, 99 S.Ct. 289, 58 L.Ed.2d 262 (1978); *United States v. Palacios*, 556 F.2d 1359, 1364 n.g. (5th Cir. 1977); *United States v. Beasley*, 519 F.2d 233, 247 (5th Cir.), *vacated and remanded on other grounds*, 425 U.S. 956, 96 S.Ct. 1736, 48 L.Ed.2d 201 (1976). In light of the foregoing, we find no support for the appellants' claim of undue vagueness as to the allegations of their indictment.

### C. *Sufficiency of the Evidence*

We consider next the appellants' attack on their convictions as based on insufficient evidence. The appellant, Felix Ramos, refutes the existence of proof beyond a reasonable doubt that he conspired to possess or distribute methaqualone. Insisting that he participated in no criminal activity until the day of his arrest, when he was paid to drive the red Cadillac to Burger King having been told its trunk contained stolen radios, Ramos argues that the evidence pursuant to which he was convicted at trial is equally consistent with a hypothesis of his innocence. Ramos additionally contests his actual or constructive possession of the methaqualone.

■ Given, however, that the evidence presented at trial must be evaluated in a light most favorable to the government, with all conflicts as to credibility and interpretations of fact resolved in favor of the jury's determination, *see Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680, 704 (1942), the finding of Ramos's guilt appears entirely supportable. Ramos's conveyance of the contraband in his red Cadillac, his presence in the Burger King parking lot and participation there in discussions regarding the imminent delivery of the "ludes," as well as his reassurance to Agent Mazzilli that "the stuff is here" as he handed to the agent the keys to his red Cadillac at the U-Totem parking lot, all provided the jury with an adequate basis to conclude that he knowingly had engaged in unlawful activity as charged. *United States v. Alvarez*, 625 F.2d 1196, 1198 (5th Cir. 1980) (en banc).

■ These same facts, including Ramos's operation of the car containing the controlled substance, his turning over of the car keys to Agent Mazzilli and the specific offering of his final permission to open the trunk, support a finding of his constructive, if not actual, possession of the contraband. *See United States v. Love*, 599 F.2d 107 (5th Cir. 1979), *cert. denied*, 444 U.S. 944, 100 S.Ct. 302, 62 L.Ed.2d 312 (1979); *United States v. Sink*, 586 F.2d 1041 (5th Cir. 1978).

Having asked ourselves, as we must, whether reasonable minds could conclude that the evidence is inconsistent with any reasonable hypothesis of Ramos's innocence, *see, e.g., United States v. Richards*, 638 F.2d 765, 768 (5th Cir. 1981), we answer, resoundingly, in the affirmative.

■ In their separate brief, the Martis argue that the evidence was insufficient to prove their knowing possession or distribution of diazepan. Like Ramos, they too point to their lack of actual possession of

the diazepan. Constructive possession of a controlled substance, however, which may be shared with others and established by either circumstantial or direct evidence, *Garza v. United States*, 385 F.2d 899 (5th Cir. 1967), is sufficient to sustain the appellants' convictions under 21 U.S.C. § 841(a).

■ All appellants were present at and participated in the face-to-face discussions regarding delivery of the pills at the Burger King parking lot. Each performed a distinct role in the transaction: Edward Marti confirmed that he had arranged for the delivery, assuring Agent Mazzilli that he had told his source over the phone to bring the pills at once and pointing out to Mazzilli the subsequent arrival of the pills by car; Rene Marti supervised the delivery, indicating that the merchandise was "here," referring to the trunk of Felix Ramos's car, and specifying that Mazzilli's money be turned over to him as a condition of the delivery; and, finally, Edward, Rene and Felix Ramos all participated in the decision as to when Mazzilli could examine the contraband. These acts of dominion and control over the contraband provide an evidentiary basis for concluding that each appellant indeed had constructive possession of the pills. They reflect, additionally, the appellants' unlawful distribution, since each knowingly participated in turning over the controlled substance to the ostensible buyer, Agent Mazzilli.

### D. *Double Jeopardy*

■ Edward Marti attacks as a violation of double jeopardy his conviction under Count One for conspiracy to possess and distribute methaqualone and under Count Four for use of a communication facility to violate federal law. Contending that each of these counts represents the same unlawful transaction, he attacks his conviction under both as violative of his fifth amendment right against punishment twice for the same offense. A single transaction may, however, form the basis of different charges without offending the double jeopardy clause. *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). Only the accusation more than once of the same crime violates the fifth amendment. Whether two distinct offenses have been alleged depends on whether each charge requires proof of an element not required by the other:

> The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.

*Id.* at 304, 52 S.Ct. at 182.

■ Here the two counts challenged by Edward Marti require proof of different elements: Only Count One requires proof of an agreement; only Count Four requires proof of use of a communication facility. Having met the *Blockburger* test, the indictment reflects no fifth amendment violation.

■ Marti asserts that the principle of *United States v. Hannah*, 584 F.2d 27 (3d Cir. 1978), calls for reversal of a communication facility count where the offense charged to have been facilitated was the "inchoate crime" of conspiracy. Since, however, the offense charged to have been facilitated in Count Four was not conspiracy but rather substantive distribution of a controlled substance in violation of 21 U.S.C. § 841(a)(1), his invocation of *Hannah* is misplaced. Furthermore, *Hannah* applies only in cases in which the defendant has been acquitted of the underlying crime while having been convicted of using a telephone to commit that crime. *Id.* at 30. Such a unique situation is not present here, where Edward Marti was convicted on *all* counts.

### E. *Prejudicial Variance*

■ The appellants additionally complain of a fatal variance between the indictment's charge of conspiracy to possess and distribute methaqualone and the government's proof at trial of their actual delivery of diazepan. The appellant in *United States v. Worthington*, 642 F.2d 150 (5th

Cir. 1981), alleged a similar variance; although Worthington was indicted for both conspiracy to distribute and possession with intent to distribute the controlled substance, 1–(1-phenylcyclohexyl)—pyrrolidine (PHP), which was the actual drug he sold, at trial it was proved that he had negotiated to sell a different drug, PCP. Evidence demonstrated that during the pre-sale negotiations, Worthington had referred to the drug as rock and canab, street terms for PCP. He therefore argued that proof was of his knowing agreement to possess and distribute PCP, rather than PHP, for which he was indicted. The court rejected his challenge, noting that the similarity between PHP and PCP—controlled substances having similar chemical structures, ingested in similar manners and producing similar effects upon the user—precluded the occurrence of a prejudicial variance.

The appellants here present the same complaint, but for opposite reasons. They contend that a variance existed because the government proved a diazepan conspiracy, while having alleged one involving methaqualone. As in *Worthington*, the appellants here referred to the drug, from the time of pre-sale negotiations up to final delivery, as "ludes," a street term for methaqualone. Agent Mazzilli was additionally assured that the pills with which he would be supplied were "lemon 714's"—the trademark of the firm manufacturing Quaaludes. Finally, testimony by a forensic chemist indicated that diazepan frequently is substituted for methaqualone. R. 3 at 372.

While in the *Worthington* indictment the substantive as well as the conspiracy counts referred to PHP, only the initial conspiracy count of the instant indictment refers to methaqualone; the remaining substantive counts charge actual possession and distribution of diazepan. This distinction renders the present appellants' allegation of a variance weaker still than that rejected by this court in *Worthington*. Charged with conspiracy to possess and to distribute methaqualone, the appellants here were found guilty of the same; proof at trial was of the existence of an unlawful agreement to possess and distribute "ludes" and "lem-

on 714's," common terms signifying methaqualone. It therefore would appear that no variance existed. We join in the *Worthington* court's additional observation that "the jury might legitimately infer 'that one who possesses dangerous drugs knows what it is.'" *Id.* [*United States v. Moser*, 509 F.2d 1089 (7th Cir. 1975)] at 1089. *Worthington* at 152. *See also United States v. Morales*, 577 F.2d 769 (2d Cir. 1978); *United States v. Jewell*, 532 F.2d 697 (9th Cir.) (en banc), *cert. denied*, 426 U.S. 951, 96 S.Ct. 3173, 49 L.Ed.2d 1188 (1976); *United States v. Davis*, 501 F.2d 1344 (9th Cir. 1974).

The appellant in the recent case of *United States v. Gonzalez*, 661 F.2d 488 (5th Cir. 1981), had been indicted for conspiring to distribute and possess methaqualone. At trial, however, the government proved the actual delivery of diazepan, as well as of methaqualone. Gonzalez consequently charged a fatal variance between the indictment and the proof. Since in *Gonzalez* methaqualone actually had changed hands, the case's factual posture differs from our appellants'; nevertheless, *Gonzalez* remains instructive since it deals with the same drugs—methaqualone and diazepan—as those involved here.

The court in *Gonzalez* found that a variance indeed existed. This finding, however, was only a preface to the court's analysis. A variance warrants reversal solely if it is prejudicial, meaning that it affects a defendant's substantial rights, "either by insufficiently informing him of the charges against him such that he is taken by surprise and prevented from presenting a proper defense, or by affording him insufficient protection against reprosecution for the same offense." *United States v. Juarez*, 573 F.2d 267, 278 (5th Cir. 1978).

This court in *Gonzalez* found that no prejudice had occurred. Even were we wholly to accept the appellants' charge of a variance, we would have to echo the court's finding in *Gonzalez* that no substantial rights of the appellants were affected:

He [Gonzalez] was clearly aware of the charges against him. Count One speci-

fied the inclusive dates of the conspiracy and Gonzalez should have been prepared to defend against the events which transpired on those dates. The diazepan transaction occurred on June 20, 1980, the last inclusive date in the charged conspiracy. There was no surprise because, prior to trial, defense counsel knew about the second attempted sale involving the 40,000 pills and that the drugs were in the hands of the prosecutor ... The variance, at most, was harmless error which does not justify the reversal.

*Id.* at 492–493.

As was Gonzalez, so too were our appellants aware of the nature of the charges against them, having been apprised by Count One of the specific dates of the conspiracy. On that basis, as well as in light of the similarity between diazepan and methaqualone, diazepan's frequent substitution for methaqualone and the conspirators' representation that they were supplying methaqualone, we find that any possible variance between the indictment and the proof was harmless.

### F. Conviction and Sentencing of Felix Ramos under Count Four

Finally, the appellant, Felix Ramos, requests correction of his erroneous sentencing under Count Four of the indictment, for use of a communication facility to further the commission of a felony.

Ramos was charged and convicted under Counts One, Two and Three only. Nevertheless, in his Judgment and Commitment Order of November 14, 1980, the trial judge inadvertently sentenced Ramos under all four counts of the indictment. Happily, this mistake has been fully corrected. On December 3, 1980, the trial judge issued another order correcting the prior Judgment and Commitment Order. The order of December 3rd explicitly states that Ramos was indicted and convicted of the offenses in Counts One, Two and Three only, and vacated any reference to Count Four in the previous Judgment and Commitment Order. Accordingly, Ramos no longer has any cause for complaint.

On the basis of the above evaluation, we reject the appellants' allegations of error. Their convictions at the trial level are consequently AFFIRMED.