**UNITED STATES of America**

v.

**Anibal ACEVEDO VILA, et al.**

**Criminal No. 3:08–cr–36–PJB.**

United States District Court, D. Puerto Rico.

Dec. 1, 2008.

Maria Dominguez–Victoriano, Ernesto G. Lopez–Soltero, United States Attorney's Office, San Juan, PR, for United States of America.

Harry Anduze–Montano, Harry Anduze Montano Law Office, Francisco Rebollo–Casalduc, Francisco Rebollo Casalduc Law Office, Thomas R. Lincoln–San–Juan, Thomas R. Lincoln Law Office, Maria H. Sandoval, Maria H. Sandoval Law Office, Diego A. Ramos, Roberto A. Camara–Fuertes, Fiddler, Gonzalez & Rodriguez, Juan R. Acevedo–Cruz, Eliseo Roques–Arroyo, Martinez Odell & Calabria, Jose R. Aguayo, Jose R. Aguayo Law Office, Roberto Buso–Aboy, Buso Aboy Law Office, Joaquin Monserrate–Matienzo, Joaquin Monserrate Matienzo Law Office, Antonio Moreda–Toledo, Moreda & Moreda, Irma R. Valldejuli–Perez, San Juan, PR, Bradford Allan Berenson, Thomas C. Green, Sidley Austin LLP, Washington, DC, Michael M. Mustokoff, Duane Morris, Amy Shellhammer, Kurt K. Lunkenheimer, Henry E. Hockeimer, Ballard, Spahr, Andrews & Ingersoll, LLP, Benjamin M. Mather, Thomas M. Gallagher, Pepper Hamilton LLP, Philadelphia, PA, Ramon Garcia–Garcia, Santurce, PR, Hector E. Guzman–Silva, Joseph C. Laws, Rafael Andrade–Ravelo, Hector L. Ramos–Vega, Federal Public Defender's Office, Hato Rey, PR, Michael S. Pasano, Paul A. Calli, Carlton Fields, Miami, FL, Richard O. Dansoh, Richard O. Dansoh LLM, Coral Gables, FL, Ramon A. Cestero, Jr., Ramon A. Cestero Law Office, Guaynabo, PR, for Anibal Acevedo Vila, et al.

### MEMORANDUM AND ORDER

PAUL BARBADORO, District Judge.

Anibal Acevedo Vila, Candido Negron Mella, Salvatore Avanzato, Jorge Velasco Mella, Robert M. Feldman, Marvin I. Block, Ramon Velasco Escardille, Edwin Colon Rodriguez, Eneidy Coreano Salgado, Luisa Inclan Bird, Miguel Nazario Franco, Ricardo Colon Padilla, and Jose Gonzales Freyre have been named as de-

fendants in a twenty-seven count indictment. All of the charged crimes concern either Acevedo Vila's 2000 and 2002 campaigns for Resident Commissioner or his 2004 gubernatorial campaign.

The charges fall into three categories. Counts 1–9 stem from an alleged conspiracy to make, receive, and conceal illegal contributions to Acevedo Vila's Resident Commissioner campaigns. Counts 10–24 result from an alleged scheme to illegally obtain approximately $7 million in public financing for Acevedo Vila's 2004 gubernatorial campaign. Counts 25–27 are based on an alleged conspiracy to prevent the Internal Revenue Service ("IRS") from ascertaining and collecting taxes that Acevedo Vila owed in 2003 and 2004 on certain taxable benefits that he allegedly received from his campaign committee and political supporters.

Acevedo Vila has moved to dismiss many of the counts against him and other defendants have either joined in his motion or have filed their own motions raising similar arguments. I address defendants' motions collectively and analyze the challenges they present to each category of charges in turn.

## I. COUNTS 1–9

### A. BACKGROUND

Acevedo Vila and nine other defendants are charged in Count 1 with participating in a conspiracy to make, receive, and conceal illegal campaign contributions to Acevedo Vila's 2000 and 2002 campaigns for Resident Commissioner. Counts 2–9 charge several of the defendants named in Count 1 with making false statements to the Federal Election Commission ("FEC") and the Federal Bureau of Investigation ("FBI") in an effort to further the conspiracy and conceal its existence.

The conspiracy was allegedly carried out in three phases. The first phase (the "Collaborator Contribution Scheme") took place between September 1999 and May 2000. During this period, Acevedo Vila, Velasco Escardille, Colon Rodriguez, and other unnamed conspirators allegedly recruited contributors to pay off Acevedo Vila's campaign debt to an unnamed corporation. The defendants implemented this scheme by causing Acevedo Vila's supporters to make contributions directly to the corporation without recording the contributions in the books and records of Acevedo Vila's campaign committee. The campaign committee also failed to report the contributions to the FEC as the law required. To further conceal the contributions, false invoices were prepared to make it appear as if the contributions were payments for services rendered by the corporation to the contributors. More than $180,000 in illegal campaign contributions allegedly were received by Acevedo Vila's campaign committee in connection with the Collaborator Contribution Scheme. (See Indictment, Doc. No. 9, at 8–9, 13–16.)

The second phase of the conspiracy (the "Family and Staff Conduit Contribution Scheme") occurred between September 2001 and December 2002. Acevedo Vila and Inclan Bird allegedly solicited members of Acevedo Vila's family, as well as staff members at the Resident Commissioner's office, to serve as conduits for illegal campaign contributions. The conduits made contributions to Acevedo Vila's campaign committee, and Acevedo Vila and Inclan Bird reimbursed the conduits for their contributions with cash or checks. The campaign committee concealed the true nature of the conduit contributions by filing false contribution reports with the FEC. More than $10,000 in conduit contributions allegedly were received by Acevedo Vila's campaign committee in connec-

tion with the Family and Staff Conduit Contribution Scheme. (*Id.* at 9, 16–18.)

The third phase of the conspiracy (the "Philadelphia Conduit Contribution Scheme") took place between February 2002 and June 2003. Acevedo Vila, Feldman, Negron Mella, Avanzato, Velasco Mella, and Coreano Salgado allegedly worked together to obtain and conceal the true nature of conduit contributions ostensibly made by a group of contributors in the Philadelphia, Pennsylvania area. More than $130,000 in conduit contributions allegedly were received by Acevedo Vila's campaign committee during this phase of the conspiracy. (*Id.* at 10–13, 18–26.)

## B. *DUPLICITY*

■■ Defendants first contend that the conspiracy count must be dismissed because it is duplicitous. As the U.S. Court of Appeals for the First Circuit has explained, "[d]uplicity is the joining in a single count of two or more distinct and separate offenses." *United States v. Verrecchia,* 196 F.3d 294, 297 (1st Cir.1999) (quoting *United States v. Canas,* 595 F.2d 73, 78 (1st Cir.1979)). Defendants argue that Count 1 is duplicitous because it improperly sweeps three distinct criminal schemes into a single conspiracy charge.[1]

Defendants develop their argument by carefully deconstructing the conspiracy count. They note that each of the three phases of the conspiracy began and ended at different times. They point to the fact that Acevedo Vila is the only defendant

who allegedly participated in all three phases of the conspiracy. They complain that the Collaborator Contribution Scheme differs from the other two schemes in the way in which the illegal fundraising was concealed. They argue that the Philadelphia Conduit Contribution Scheme is distinct because it was carried out on the mainland rather than in Puerto Rico. Finally, they assert that each scheme had a different specific objective and that the alleged conspirators lacked common motivations. For all of these reasons, defendants argue that each phase of the conspiracy must be charged in a separate conspiracy count. (*See* Def. Acevedo Vila's Mot. to Dismiss, Doc. No. 182, at 5–16.)

■■ I am unpersuaded by defendants' argument. A single conspiracy does not necessarily fracture into multiple conspiracies simply because the conspiracy was carried out in different phases. *United States v. Eppolito,* 543 F.3d 25, 47–48 (2d Cir.2008); *United States v. Small,* 423 F.3d 1164, 1184 (10th Cir.2005); *United States v. Calderon,* 127 F.3d 1314, 1329 (11th Cir.1997). Nor are changes in membership dispositive. *Eppolito,* 543 F.3d at 48; *United States v. Segines,* 17 F.3d 847, 856 (6th Cir.1994). A single conspiracy can also encompass multiple criminal methods, *United States v. Brandon,* 17 F.3d 409, 451 (1st Cir.1994), and it can be carried out at different locations, *United States v. Walker,* 142 F.3d 103, 112 (2d Cir.1998). Finally, the individual motivations that lead participants to join a conspiracy may differ

---

[1] A charge ordinarily should not be dismissed simply because it is duplicitous. 1A Charles Allen Wright and Andrew D. Leipold, *Federal Practice and Procedure* § 145 (4th ed. 2008). Instead, the government generally will be permitted to choose the single charge on which it intends to proceed. *Id.* In this case, however, both the Collaborator Contribution Scheme and the Family and Staff Conduit Contribu-

tion Scheme would be barred by the statute of limitations if I were to treat each phase of the charged conspiracy as a separate conspiracy. Thus, if I were to determine that Count 1 is duplicitous, I would dismiss the Collaborator Contribution Scheme and the Family and Staff Conduit Contribution Scheme and instruct the government to proceed only on the Philadelphia Conduit Contribution Scheme.

without precluding the existence of a single conspiracy. *Eppolito*, 543 F.3d at 48. Although all of these factors may be considered at trial in determining whether a charged conspiracy is in fact a series of separate conspiracies, *United States v. Trainor*, 477 F.3d 24, 33 (1st Cir.2007), none are necessarily decisive in determining whether a conspiracy count is duplicitous. Instead, duplicity is assessed by identifying the "unit of prosecution" for the charged offense. *Verrecchia*, 196 F.3d at 297; *United States v. Haddy*, 134 F.3d 542, 548 (3d Cir.1998).

■■■ Identifying the appropriate unit of prosecution is a matter of statutory interpretation. *Sanabria v. United States*, 437 U.S. 54, 69, 98 S.Ct. 2170, 57 L.Ed.2d 43 (1978). Because the U.S. Supreme Court has repeatedly recognized that "the essence of a conspiracy is an 'agreement to commit an unlawful act,' " *United States v. Jimenez Recio*, 537 U.S. 270, 274, 123 S.Ct. 819, 154 L.Ed.2d 744 (2003) (citations omitted), the unit of prosecution for the offense of conspiracy is the criminal agreement on which the conspiracy charge is based. *Braverman v. United States*, 317 U.S. 49, 54, 63 S.Ct. 99, 87 L.Ed. 23 (1942). Accordingly, defendants' duplicity challenge turns on whether the Indictment properly alleges that all of the conspirators joined in a common agreement to achieve the conspiracy's unlawful objectives.

■■■ The conspiracy count charges that the conspirators joined in a common agreement to solicit, receive, and conceal illegal contributions for Acevedo Villa's campaigns for Resident Commissioner. The alleged agreement spanned all three phases of the alleged conspiracy and encompassed all of the alleged conspirators. No more than this is required for the conspiracy count to survive defendants' duplicity challenge. Whether the evidence at trial will support the government's contention is a matter that will have to be resolved at a later stage of the proceedings.[2]

## C. *VAGUENESS*

Inclan Bird argues that Count 1 is too vague and "falls far short of describing in any coherent way how Defendant Inclan Bird's conduct violates the law." (Def. Inclan Bird's Mot. to Dismiss, Doc. No. 169, at 4.) Inclan Bird is mentioned only twice in the overt acts comprising Count 1, namely, the allegation that in 2001 she solicited, and then later reimbursed, conduit contributions.

■■■ An indictment must present a "plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed.R.Crim.P. 7(c)(1). The goal is to provide enough information to make the defendant aware of the charges against which she must defend and allow her to "plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974); *see United States v. Resendiz–Ponce*, 549 U.S. 102, 108, 127 S.Ct. 782, 166 L.Ed.2d 591 (2007). "The allegations of an indictment are presumed to be true for the purposes of assessing whether an indictment is sufficient to withstand a motion to dismiss, and inquiry into whether the government can prove its case at trial is inappropriate at this stage." *United States v. Dunbar*, 367 F.Supp.2d 59, 60 (D.Mass.2005).

---

**2.** Feldman has moved to dismiss Count 1 for lack of venue. As he acknowledges, however, his motion is based on the assumption that Count 1 is duplicitous. (Def. Feldman's Mot. to Dismiss, Doc. No. 177, at 2.) Because I reject defendants' duplicity challenge, I also deny Feldman's motion to dismiss for lack of venue.

■ Count 1 tracks the language of 18 U.S.C. § 371. As required, it alerts the defendants to the charge against them, the time period of the unlawful alleged activity, those claimed to be involved, and the specific conduct at issue. *See United States v. Olderbak*, 961 F.2d 756, 760 (8th Cir.1992) (requirements of 7(c)(1) met because indictment "sufficiently apprised the defendants of the time frame of the alleged drug activity, the members of the alleged conspiracy, and the type of drugs involved"); *United States v. Ramos*, 666 F.2d 469, 474 (11th Cir.1982) (an indictment that tracks the statute's language, "supplemented by precise allegations of the time and place of the criminal activity" and "the names of the participants and the controlled substance involved," is sufficient). It also alleges that the defendants agreed to illegally raise money to support Acevedo Vila's political ambitions and to take steps to conceal the true nature of their plot. Specific overt acts are alleged, and while only a few of them name Inclan Bird in particular, she nonetheless is identified as a central player in the alleged conspiracy. In short, the allegations are sufficiently detailed to withstand defendants' vagueness challenge.

## II. *COUNTS 10–24*

### A. *BACKGROUND*

Counts 10–24 stem from an alleged scheme to obtain approximately $7 million in public financing for Acevedo Vila's 2004 gubernatorial campaign without complying with the spending cap that Puerto Rico's electoral law imposes on recipients of public financing. Counts 10–21 charge Acevedo Vila, Velasco Escardille, Inclan Bird, Nazario Franco, Colon Padilla, and Gonzalez Freyre with wire fraud. Count 22 charges all of the wire fraud defendants except Velasco Escardille and Gonzalez Freyre with program fraud. Counts 23 and 24 charge Gonzalez Freyre and Colon Padilla with making false statements to agents of the FBI and the IRS in an effort to conceal illegal campaign contributions to Acevedo Vila's gubernatorial campaign. (*See* Indictment, Doc. No. 9, at 34–48.)

Defendants attack the legal theory that underlies the wire fraud and program fraud counts. Because their argument is based on Puerto Rico's electoral law, I first provide an overview of that law and then turn to the merits of defendants' argument.

### B. *THE ELECTORAL LAW*

Puerto Rico's electoral law establishes two sources of public funding that candidates for governor may draw on to subsidize their election campaigns.

The "Electoral Fund" is available to all qualifying political parties and their gubernatorial candidates. P.R. Laws Ann. tit. 16, § 3116 (2007). In non-election years, each party and its candidate may draw up to $300,000 from the Electoral Fund. *Id.* The amount increases to $600,000 in election years. *Id.* Monies obtained from the Electoral Fund must be used exclusively to defray "administrative campaign expenses and political propaganda in Puerto Rico." § 3118. Candidates and political parties that draw on the Electoral Fund must report all expenses chargeable to the Fund every three months. § 3109. The Secretary of the Treasury is barred from making disbursements from the Electoral Fund to a participating candidate until the candidate complies with the law's reporting requirements. *Id.*

Gubernatorial candidates and their political parties may also participate in the "Voluntary Fund." To enroll, a candidate must agree to abide by the terms of the program and file a certification to that effect with the Secretary of the Treasury.

§ 3117. If the required certification is filed, participation in the Voluntary Fund is "final and binding and may not be revoked for that specific general election." *Id.* The Voluntary Fund is maintained by the Treasury Department, which is responsible for the custody, management, and disbursement of the resources therein. The Voluntary Fund is "nurtured by private and public resources," meaning that it is financed both with public funds and private contributions raised by the political parties and gubernatorial candidates. *Id.* Interest that accrues on money deposited in the Voluntary Fund, money recovered through civil penalties resulting from violations of the Voluntary Fund's terms, and money left unused by former candidates who previously participated in the public financing system are some of the other sources of revenue for the Voluntary Fund. § 3117(b).

Once a candidate agrees to participate in the Voluntary Fund by filing the required certification, the Secretary of the Treasury deposits $3 million into a Voluntary Fund account for that candidate. § 3117(c)(1). The candidate (and the political party with which he is affiliated) can then raise up to an additional $4 million in private contributions, which must also be deposited into the candidate's account. § 3117(c)(2). The Treasury Department will match any private contributions up to $4 million. § 3117(c)(3). Money deposited into the Voluntary Fund must be used "exclusively to defray the campaign expenses of the political party and its campaign for governor." § 3117(e).

Section 3117a of the electoral law imposes a·spending cap of $11 million on gubernatorial candidates who participate in the Voluntary Fund. It also provides that "[a]ny political party, candidate for governor and any candidate for mayor that exceeds the limits provided in this section shall be subject to a civil penalty and the procedures provided in § 3109 of this title."

Section 3109 states in pertinent part that "[a]ny party entitled to the Electoral Fund, which exceeds the limits established in this subtitle or its Regulations for its campaign expenses, shall be subject to the payment of a penalty equal to two (2) times the sum in excess of the limits provided in this subtitle." It also authorizes the Electoral Commission to go to court to recover the penalty and to stop continued violations of the electoral law.

Section 3354 makes it a crime for a person to "knowingly and fraudulently" violate the electoral law. Section 3366 specifically addresses spending violations by making it unlawful for any person to "pay or incur in campaign information media expenses ... in excess of the limits established in this subtitle."

## C. *ANALYSIS*

The wire fraud and program fraud counts allege that defendants enabled Acevedo Vila to draw on his Voluntary Fund account by fraudulently concealing the fact that his campaign had exceeded Puerto Rico's public financing spending cap.[3] As the government acknowledges,

---

**3.** The wire fraud counts allege that "[t]he object of the scheme and artifice to defraud, was for defendant ACEVEDO VILA and Comité Anibal to obtain public campaign financing from the Puerto Rico Treasury Department in the approximate amount of $7,000,000 by circumventing certain legal requirements required by the Commonwealth of Puerto Rico's public campaign financing laws." (Indictment, Doc. No. 9, at 38–39.) The counts then go on to identify the spending cap as the legal requirement that defendants schemed to circumvent. Although the program fraud count does not specify the fraud scheme that defendants allegedly used to obtain access to public financing, the govern-

the charges thus depend upon the premise that Puerto Rico's electoral law bars a candidate from drawing on his Voluntary Fund account if his campaign has exceeded the spending cap. *See* Transcript of Oral Argument at 94–97, *United States v. Acevedo Vila*, No. 08–cr–036 (Sept. 23, 2008).

Defendants attack the premise on which the wire fraud and program fraud charges are based by contending that the electoral law subjects a candidate who exceeds the spending cap to a civil penalty and the possibility of criminal prosecution but does not bar the candidate from drawing on his Voluntary Fund account. Thus, they argue that the charges at worst allege a scheme to violate local law rather than a scheme to deprive Puerto Rico of "property." Such schemes cannot be the basis of either wire fraud or program fraud charges, they argue, because both crimes require proof that the object of the alleged fraud was "property" in the hands of the victim.[4]

The government responds to the defendants' argument solely by challenging their interpretation of the electoral law. In the government's view, that law plainly bars a candidate from drawing on the Voluntary Fund after his campaign has exceeded the spending cap. Thus, the charged scheme to conceal excessive campaign spending is prosecutable as wire fraud and program fraud, the government argues, because it is a scheme to obtain access to the Voluntary Fund rather than a scheme merely to conceal violations of

Puerto Rican law. The government presents three arguments in support of its position and I examine each argument in turn.

The government first argues that a candidate is barred from drawing additional money from the Voluntary Fund after he has exceeded the spending cap because the electoral law prohibits the Secretary of the Treasury from making further disbursements to such candidates. The government bases its argument on sections 3117a and 3109 of the electoral law. Section 3117a establishes the spending cap and provides that candidates who exceed the cap "shall be subject to a civil penalty and the procedures provided in § 3109 of this title." Section 3109 does four things: it requires candidates who participate in the Electoral Fund to report expenditures chargeable to the Fund; it states that "[t]he Secretary of the Treasury shall not authorize any disbursement whatsoever chargeable to the Electoral Fund, for any party or candidate until the provisions of this section are complied with"; it establishes the penalty for excessive campaign spending; and it empowers the Electoral Commission to go to court to recover the penalty and to "stop the continued violation of this subtitle." The government focuses on the second of these four provisions in arguing that the Secretary's duty to withhold disbursements in section 3109 is one of the "procedures" that candidates who exceed the spending cap are subject to pursuant to section 3117a.

ment concedes that it too is based on the fraudulent concealment of excessive campaign spending.

4. The U.S. Supreme Court has construed the mail and wire fraud statutes to require that the object of the charged fraud scheme must be property in the hands of the victim. *See Pasquantino v. United States*, 544 U.S. 349, 355 & n. 2, 125 S.Ct. 1766, 161 L.Ed.2d 619 (2005) (wire fraud); *Cleveland v. United*

*States*, 531 U.S. 12, 26–27, 121 S.Ct. 365, 148 L.Ed.2d 221 (2000) (mail fraud). The type of program fraud at issue here explicitly requires proof that "property" was "obtain[ed] by fraud." 18 U.S.C. § 666(a)(1)(A). Thus, neither statute can be used to prosecute a scheme to conceal violations of local law unless the scheme is also designed to deprive a victim of property.

■ The central difficulty with the government's argument is that it is inconsistent with the statutory text on which it depends. For the government's argument to succeed, the Secretary of the Treasury's duty in section 3109 to withhold disbursements would apply to disbursements from the Voluntary Fund even though that duty expressly encompasses only disbursements from the Electoral Fund, it would be triggered by excessive campaign spending even though section 3109 specifies that the Secretary may only withhold disbursements from candidates who fail to comply with the section's reporting requirements, and it would result in a permanent ban on disbursements from the Voluntary Fund after the spending cap has been exceeded even though section 3109 specifies that disbursements are to be withheld only until the candidate complies with the section's requirements. Such a strained reading of section 3109 cannot be justified simply because section 3117a subjects candidates who exceed the spending cap to the "procedures" set forth in section 3109. Instead, as defendants more sensibly contend, the reference to "procedures" in section 3117a includes only the power that section 3109 gives to the Electoral Commission to go to court to recover the penalty for excessive spending and to halt further violations of the electoral law.

■ The administrative regulations that implement sections 3109 and 3117a support this reading of the electoral law. Part XVI of the Treasury Department Rules and Regulations No. 48 provides at paragraph 8:

Each political party ... will maintain a complete and detailed accounting of any expense incurred by them and charged to the Electoral Fund or the Voluntary Fund. Every three (3) months within the first ten (10) days following the end of the report period, they must also submit to the Commission and the Secretary a report, duly sworn, certifying these expenses, including the date of the expense, the name of the person in whose favor payment was ordered and their complete address, as well as the reason for incurring in this expense. *The Secretary will not authorize any disbursement from the Electoral Fund or the Voluntary Fund to any party or independent candidate, until the obligation of submitting the reports is complied with.*

(Treasury Rules and Regulations No. 48, Doc. No. 352–17, at 57.) Paragraph 9 of the regulations provides in pertinent part that:

[A]ny political party that avails itself of the Electoral Fund and/or the Voluntary Fund and whose campaign expenses are in excess of the limits established in the Law or its rules and regulations, will be subject to a penalty payment equal to twice (2 times) the amount of the excess expenditures ... [and the] Commission will go to the appropriate Court of Justice with the suitable resource to impede the continued violation....

(*Id.* at 52.) When these two paragraphs are construed together, they support the view that the Secretary of the Treasury's power to withhold disbursements is limited to situations in which a candidate or party has failed to comply with its reporting obligations, whereas the power to enforce the spending cap is given exclusively to the Electoral Commission. Accordingly, I am unpersuaded by the government's contention that section 3109 gives the Secretary of the Treasury the power to withhold disbursements from candidates who have exceeded the spending cap.

The government next argues that candidates' lose the right to draw on the Voluntary Fund after they exceed the spending cap because the Electoral Commission's

power in section 3109 to go to court to stop continued violations of the electoral law necessarily includes the power to stop a candidate who has exceeded the spending cap from drawing on the Voluntary Fund. This argument is plainly without merit.

 A candidate who elects to participate in the Voluntary Fund violates the spending cap by spending more than $11 million on his campaign. *See* § 3117a. A request for reimbursement from the Voluntary Fund is not an expenditure, and thus, it does not violate the spending cap. Nor does any other provision of the electoral law make it unlawful for a candidate who has exceeded the spending cap to seek reimbursement from the Voluntary Fund. Accordingly, the Electoral Commission's power to go to court to stop continued violations of the electoral law does not include the power to stop a candidate who has exceeded the spending cap from drawing on the Voluntary Fund.

The government's third argument is that its interpretation of the electoral law must be adopted because it would be absurd to construe the law to permit a candidate to continue to benefit from the Voluntary Fund after he has exceeded the spending cap. I am also unpersuaded by this argument.

The Puerto Rican legislature has chosen to enforce the spending cap by subjecting violators to a civil penalty and the possibility of criminal prosecution. Under the government's interpretation of the elector-al law, a candidate who exceeds the spending cap by even a small amount would also be completely barred from drawing on the Voluntary Fund even to obtain reimbursement for expenses that were incurred before the spending cap was exceeded. This could result in the complete loss of up to $7 million in public funding as well as the forfeiture of up to $4 million in contributions raised from private sources. Clearly, the legislature reasonably could have concluded that it did not need to subject candidates to such potentially harsh consequences in order to deter spending cap violations given the alternative enforcement mechanisms that are expressly included in the electoral law. Thus, I do not agree that the electoral law would be absurd unless I adopted the government's proposed interpretation of the law.

 In summary, I am unpersuaded by the government's argument that a candidate who exceeds the spending cap is thereafter barred from drawing on the Voluntary Fund. Instead, I agree with the defendants that the electoral law allows a candidate to draw on the Voluntary Fund even if he has exceeded the spending cap. Accordingly, a scheme to conceal campaign spending in violation of the spending cap is a scheme to violate Puerto Rican law rather than a scheme to defraud Puerto Rico of its contributions to the Voluntary Fund. Because such a scheme cannot serve as the basis for wire fraud or program fraud prosecution, the charges are defective and must be dismissed.[5]

---

**5.** Gonzales Freyre is charged in Count 23 with making a false statement to agents of the FBI and the IRS concerning a disguised political contribution to Acevedo Vila's gubernatorial campaign. He argues that the alleged false statement cannot be material as a matter of law because it concerned only a potential violation of local election law that neither the FBI nor the IRS have jurisdiction to investigate. I disagree. Materiality presents a mixed question of law and fact that ordinarily must be resolved by a jury. *United States v. Gaudin*, 515 U.S. 506, 522–23, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995). I cannot conclude as a matter of law that both the FBI and the IRS lacked jurisdiction to question Gonzales Freyre concerning disguised political contributions to Acevedo Vila's gubernatorial campaign. Accordingly, defendant's mo-

## III. COUNTS 25–27

### A. BACKGROUND

Acevedo Vila and Inclan Bird are charged in Count 25 with conspiracy to prevent the IRS from correctly ascertaining and collecting income taxes that Acevedo Vila owed to the federal government on certain taxable benefits that he allegedly received from his campaign committee and political supporters. Counts 26 and 27 charge Acevedo Vila with filing false federal income tax returns. (*See* Indictment, Doc. No. 9, at 49–55.)

Acevedo Vila and Inclan Bird have moved to dismiss the conspiracy count because they claim that it fails to properly allege a conspiracy to defraud. Acevedo Vila also challenges the false tax return counts because he claims that the charges are based on a legal theory that the government concedes it has no evidence to support. I address each argument in turn.

### B. CONSPIRACY COUNT

 A conspiracy to defraud the United States by frustrating the functions of the IRS is known as a *Klein* conspiracy. *See generally United States v. Klein*, 247 F.2d 908 (2d Cir.1957). A *Klein* conspiracy consists of three elements that must be alleged in an indictment: (1) an agreement between two or more people to accomplish an unlawful objective against the United States; (2) the commission of an overt act in furtherance of the conspiracy; and (3) the knowing and voluntary participation of the defendants in the conspiracy. *See Brandon*, 17 F.3d at 428. "Such conspiracies to defraud are not limited to those aiming to deprive the government of money or property, but include conspiracy to interfere with government functions." *United States v. Goldberg*, 105 F.3d 770, 773 (1st Cir.1997). In addition, the means

used to achieve the unlawful goal of the conspiracy need not be unlawful and the government need not demonstrate that taxes have not been paid. *See United States v. Tarvers*, 833 F.2d 1068, 1075 (1st Cir.1987).

Acevedo Vila and Inclan Bird have filed overlapping motions to dismiss Count 25 on the grounds that a *Klein* conspiracy has not been sufficiently alleged. Defendants argue that the conspiracy count fails to properly allege the following: (1) an agreement; (2) an unlawful purpose to defraud; and (3) defrauding or interfering with the IRS. I will consider each of these arguments in turn. (Def. Acevedo Vila's Mot. to Dismiss, Doc. No. 182–2, at 45–50.)

#### 1. Agreement

 Acevedo Vila and Inclan Bird argue that Count 25 fails to properly allege that they agreed to obstruct the IRS's functions. They argue that Count 25 makes boilerplate allegations tracking the language of section 371, but does not provide any factual allegation that they agreed to engage in unlawful activity for the purpose of concealing income. The defendants assert that Count 25 merely alleges a failure to disclose income and does not allege an agreement to interfere with government functions, as is required to establish a *Klein* conspiracy. *See United States v. Adkinson*, 158 F.3d 1147, 1154 (11th Cir.1998). However, Count 25 explicitly alleges that Acevedo Vila and Inclan Bird "did knowingly, willfully, and unlawfully, combine, conspire, confederate, and agree to defraud the United States." (Indictment, Doc. No. 9, at 50.) Such allegations ordinarily are sufficient to support this element of a conspiracy charge. *Hamling*, 418 U.S. at 117, 94 S.Ct. 2887.

tion to dismiss Count 23 (Doc. No. 190) is denied.

Acevedo Vila also argues that the only factual allegation of an agreement is that in 2006 Inclan Bird and "others" agreed to falsely claim clothing purchases for him as business expenses of the Popular Democratic Party and post-date those expenses to include them in reports to the State Electoral Commission in 2005. (Indictment, Doc. No. 9, at 53.) He asserts that this alleged agreement occurred after the relevant time period, does not suggest his participation, and does not pertain to his taxes. Although Acevedo Vila is correct that the overt acts alleged in Count 25 include an agreement between Inclan Bird and others, and that proof of this agreement alone would likely be insufficient to meet the requirements of a *Klein* conspiracy, the existence of that agreement does not suggest that an agreement between Acevedo Vila and Inclan Bird did not exist. The count does not specifically allege when or how a meeting of the minds occurred between Acevedo Vila and Inclan Bird, but it does allege sufficient facts to allow the inference of an agreement by a jury. The conspiracy count thus sufficiently alleges the first element of a *Klein* conspiracy.

### 2. *Unlawful Purpose to Defraud*

■■■ The defendants also argue that Count 25 fails to allege a *Klein* conspiracy because even if an agreement is alleged, there is no allegation that the agreement's objective was to interfere with the lawful functions of the IRS. The objective of an agreement is unlawful if it is "for the purpose of impairing, obstructing, or defeating the lawful function of any department of government." *Dennis v. United States*, 384 U.S. 855, 860–61, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966) (citations omitted). Interference with government functions cannot be a mere foreseeable consequence or collateral effect of another agreement if a *Klein* conspiracy is to be charged. *Goldberg*, 105 F.3d at 774; *United States*

*v. Pappathanasi*, 383 F.Supp.2d 289, 291–92 (D.Mass.2005). In such a conspiracy, "the fraud has to be a *purpose or object* of the conspiracy, and not merely a foreseeable consequence of the conspiratorial scheme." *Goldberg*, 105 F.3d at 773. The government must prove co-conspirators agreed to defraud the IRS, and not merely that "a defendant agreed to pay someone under the table knowing that he had no intention of reporting the money to the IRS." *Pappathanasi*, 383 F.Supp.2d at 291–92 (quoting *Goldberg*, 105 F.3d at 774).

■■■ Acevedo Vila argues that Count 25 merely makes a boilerplate allegation that tracks the language of the statute and fails to provide any factual allegation that he did anything other than fail to disclose income. However, Count 25 specifically alleges that Inclan Bird and Acevedo Vila "did knowingly, willfully, and unlawfully, combine, conspire, confederate, and agree to defraud the United States Treasury Department and the Internal Revenue Service...." (Indictment, Doc. No. 9, at 50.) This language is sufficient to allege intent by the defendants to agree to the conspiracy and to defraud the United States. *See United States v. Ervasti*, 201 F.3d 1029, 1037–38 (8th Cir.2000) (upholding as sufficient *Klein* conspiracy indictment with similar language).

■■■ Inclan Bird argues that Count 25 does not demonstrate that she intended to agree to defraud the IRS, because it describes the object of the conspiracy as concealment and there is no nexus between her alleged overt acts and the filing of the tax returns in issue. (Def. Inclan Bird's Mot. to Dismiss, Doc. No. 171, at 1–2.) However, "a conspiracy may have multiple objectives, and 'if one of its objectives, even a minor one, be the evasion of federal taxes, the offense is made out, though the primary objective may be con-

cealment of another crime.' " *Adkinson*, 158 F.3d at 1155 (quoting *Ingram v. United States*, 360 U.S. 672, 679–80, 79 S.Ct. 1314, 3 L.Ed.2d 1503 (1959)). Although Count 25 states that an object of the conspiracy was "to conceal the fact that ACEVEDO VILA's personal income was being supplemented with funds derived from political activity," (Indictment, Doc. No. 9, at 50), this does not preclude the possibility that Acevedo Vila and Inclan Bird also intended to impede the IRS, *see Adkinson*, 158 F.3d at 1155; *Goldberg*, 105 F.3d at 773–74. No case law prohibits the government from proving multiple objectives in the conspiracy. And, as noted in the preceding paragraph, Count 25 explicitly states that the agreement between Acevedo Vila and Inclan Bird was to defraud the IRS.

### 3. *Defrauding the IRS*

Acevedo Vila argues that Count 25 "does not adequately allege a scheme that could even theoretically have had the purpose to defraud the IRS, because ... no *federally* reportable income was missing from Mr. Acevedo Vila's tax returns." (Def. Acevedo Vila Mot. to Dismiss, Doc. No. 182–2, at 50.) I disagree.

 Count 25 alleges that Acevedo Vila "signed and filed false individual income tax returns" for 2003 and 2004. (Indictment, Doc. No. 9, at 53.) The government contends that it will prove at trial that federally reportable income was missing from Acevedo Vila's returns. Whether the government will be able to produce sufficient evidence to support this contention is a matter that will have to be resolved at trial.

### C. *FALSE TAX RETURN COUNTS*

Counts 26 and 27 allege that Acevedo Vila's tax returns were false because he understated his total gross income on line 22 of his federal income tax returns.[6] Acevedo Vila attacks both counts because he claims that the government admits that his entries on line 22 correctly reported his total gross income.

The government concedes that it will not argue at trial that Acevedo Vila understated his income on line 22 of his federal returns. *See* Transcript of Telephone Conference, *United States v. Acevedo Vila*, No. 08–cr–036 (Oct. 22, 2008). This is because the income that it claims Acevedo Vila failed to report was Puerto Rican-sourced income, which he was not required to include on line 22. *See generally*, 26 U.S.C. § 933. Instead, the government has informed the court that it intends to prove that Acevedo Vila's federal returns are false because he failed to properly account for his Puerto Rican-sourced income when claiming his foreign tax credit, determining the allowance amount of his deductions, and calculating his alternative minimum tax liability. Because this theory of culpability varies materially from the theory on which Counts 26 and 27 are based, Acevedo Vila could not be convicted of the charges based on the evidence that the government intends to offer at trial. *United States v. Cruz–Arroyo*, 461 F.3d 69, 77 (1st Cir.2006) (conviction barred when trial evidence varies materially and prejudicially from the charge returned by the grand jury).

Although a court ordinarily cannot dismiss a facially valid charge before trial

---

**6.** Although both counts also assert that Acevedo Vila understated his income on the Puerto Rican tax returns that he filed with his federal returns, the only reason that is apparent from the charges themselves as to why a false statement of income on the Puerto Rican returns could be material to the federal return is that it helps to conceal the understatement of total gross income on line 22 of his federal returns.

based on a claim that the trial evidence will not support the charged offense, no point would be served in waiting until the government has presented its evidence to dismiss the false tax return charges because the government concedes that it will not even attempt to prove at trial that Acevedo Vila's entries on line 22 were false. Accordingly, Counts 26 and 27 are dismissed without prejudice to the government's right to seek alternative charges that more closely conform to its anticipated evidence.

## IV. *CONCLUSION*

For the reasons set forth in this Memorandum and Order, Counts 10–22 are dismissed with prejudice and Counts 26 and 27 are dismissed without prejudice. Defendants' motions to dismiss (Doc. Nos. 169, 171, 172, 176, 177, 182, 188, 190, and 222) are otherwise denied.

SO ORDERED.